763 P.2d 1153

Gayle D. RICHARDSON, as Personal Representative of the Estate of Wade Fitzsimmons Richardson, Deceased, Petitioner,

v.

CARNEGIE LIBRARY RESTAURANT, INC. d/b/a The Country Connection, and Bennett–Cathey, Inc., Respondents.

No. 17432.

Supreme Court of New Mexico.

Oct. 18, 1988.

Rehearings Denied Nov. 21, 1988.

Shamas & Perrin, K. Douglas Perrin, Paul Snead, Roswell, for petitioner.

Sanders, Bruin, Coll & Worley, Michael T. Worley, Roswell, for respondents.

William H. Carpenter, Albuquerque, for amicus curiae New Mexico Trial Lawyers Ass'n.

Miller, Stratvert, Torgerson & Schlenker, Alice Tomlinson Lorenz, Albuquerque, for amicus curiae Defense Lawyers Ass'n.

Patrick A. Casey, D. Diego Zamora, Santa Fe, for amici curiae Mothers Against Drunk Driving, Students Against Drunk Driving.

## OPINION

WALTERS, Justice.

Wade Fitzsimmons Richardson was killed when a two-ton dumptruck driven by Billibob Lewis collided with the car that Richardson was operating. Lewis had become intoxicated at a bar owned by Carnegie Library, Inc.; he subsequently stole the dumptruck from the lot behind Bennett–

Cathey, Inc.; and he negligently drove and crashed the truck into Richardson's vehicle.

The decedent's personal representative, Gayle D. Richardson, brought a wrongful death action against Carnegie and Bennett–Cathey. Her complaint alleged that while Lewis was intoxicated, Carnegie served alcohol to him in violation of the Dramshop Act, NMSA 1978, Section 41–11–1 (Repl. Pamp.1986); that Bennett–Cathey negligently left the keys in the ignition of the unattended dumptruck; and that the negligent acts of both defendants proximately caused Richardson's death. The district court granted summary judgment in favor of Bennett–Cathey, entered a default judgment against Carnegie (for failure to answer), and found that Richardson suffered damages for which he would be entitled to recover $250,000 from Carnegie. The court awarded only $50,000, however, finding itself limited by the maximum recovery allowable under the Dramshop Act.

Richardson appealed the district court's ruling to the court of appeals, claiming error in the grant of summary judgment to Bennett–Cathey, and attacking the cap on liability under the dramshop act as unconstitutional. Richardson enumerated several "special circumstances" that would justify the imposition of liability against Bennett–Cathey: Bennett–Cathey knew that the brakes on its truck were inoperative; the lot from which Lewis stole the truck was not fenced and was easily accessible; the area where the truck was parked was frequented by transients; the truck required special skills for safe operation; and the truck was large and bulky and more capable of causing serious injuries than an automobile. She asserted that the theft of the unattended vehicle, with keys left in the ignition, was not an independent, intervening, or superseding act that would exempt Bennett–Cathey from liability. The docketing statement also presented the issue that the damage limitation on dramshop liability violated the United States and New Mexico Constitutions. In her memorandum opposing summary affirmance, Richardson argued that the statute denied equal protection because the damage cap allowed victims of a tavernkeeper's negligence to be undercompensated although victims of other tortfeasors were entitled to obtain full recovery; and further, that the damage cap violated her right to a trial by jury as guaranteed by Article II, Section 12 of the New Mexico Constitution because the cap usurped the fundamental function of a jury to determine damages.

The court of appeals, by memorandum opinion, upheld the trial court on all issues. In its first calendar notice, the court proposed affirmance of the summary judgment on grounds that the theft was not foreseeable, but instead was an intervening, superseding, criminal act by a third person. Acknowledging that several jurisdictions look to special circumstances to determine foreseeability of the harm to be caused by the negligence of an owner leaving the keys in an unattended vehicle, and the liability which attends that foreseeability, the appellate court noted that it could not overrule our opinion in *Bouldin v. Sategna*, 71 N.M. 329, 378 P.2d 370 (1963), by which it felt itself bound. *See Alexander v. Delgado*, 84 N.M. 717, 718, 507 P.2d 778, 779 (1973) (lower courts should not overrule precedents set by superior court).

Regarding the equal protection issue, the calendar notice considered that the damage cap concerned no fundamental rights and implicated no suspect classes. The court employed, therefore, the rational basis standard of review and looked to the purposes of the challenged statute. It then reasoned that the legislature had "created a cause of action" subsequent to this court's "creation" of a common-law cause of action for tavernkeeper negligence, and that its purpose was to limit dramshop liability in exchange for creating that new cause of action. Impressed that the damage cap applied equally to all persons seeking to recover under the dramshop act, the court's notice proposed affirmance on a determination that the statute did not unconstitutionally violate the equal protection clause.

In its second calendar notice, the court of appeals addressed the jury trial issue, and reiterated its conclusion that the legislature had transformed a common-law cause

of action into a statutory one. It then concluded that Richardson had a right to a trial by jury on the question of liability, but that he had no right to have a jury determine the amount of his damages because the statutory action limited the amount of liability. The court of appeals, therefore, summarily dismissed Richardson's appeal and affirmed the trial court by memorandum opinion.

We granted Richardson's petition for writ of certiorari and gave leave to file amicus curiae briefs to the New Mexico Trial Lawyers Association (NMTLA), the Defense Lawyers Association (DLA), Mothers Against Drunk Drivers (MADD), and Students Against Drunk Drivers (SADD). The only issue addressed by all of the amici briefs in support of the petitioner's application for review is the constitutionality of the dramshop act.

MADD and SADD point out that New Mexico has one of the most severe drunk-driving problems in the United States and that every conceivable approach to resolve the drunk-driving menace is needed. They agree that dramshop liability is an effective measure in curbing drunken driving, but that the salutary impact of the dramshop act is diffused by the damage cap. Urging that the limit on recovery is inconsistent with the purpose for imposing liability, they emphasize that reinforcing dramshop liability and invalidating the damage cap would best serve the public interest.

NMTLA challenges the damage cap as unconstitutional violations of the due process and equal protection clauses, the right to trial by jury, and the doctrine of separation of powers. Regarding the separation of powers argument, NMTLA contends that the legislatively mandated damage cap prevents judges from exercising their historic procedural power to exercise discretion in reviewing the excessiveness of a jury's award upon a motion for a new trial under SCRA 1986, 1–059; and that it compels judges to order a remittitur, another discretionary act historically inherent in a trial judge's powers. Because procedural rules are within the sole domain of the supreme court, and because the statutory limitation on liability impinges upon the provisions of Rule 59, NMTLA insists with some logic that the damage cap constitutes a legislative usurpation of judicial power and thus violates the doctrine of separation of powers.

NMTLA proposes, too, that the damage cap violates the right to trial by jury, arguing that the legislature did not transform dramshop liability from an action at common law to a statutory cause of action but, rather, only narrowed and modified the judicially-created common-law liability that was established in *Lopez v. Maez*, 98 N.M. 625, 651 P.2d 1269 (1982). Thus, because a plaintiff has a fundamental right to have a jury determine liability and damages in a common-law action, NMTLA argues that the damage cap unconstitutionally infringes on a party's right to trial by jury.

Amicus NMTLA contends that the damage cap also infringes the due process and equal protection clauses of the New Mexico Constitution because the rights to a jury trial and of access to the courts, being fundamental constitutional rights, are rendered meaningless if full and adequate recoveries are not available to all plaintiffs. NMTLA has traced these rights from their historic geneses in Spanish and Mexican laws, the *Siete Partidas*, the *Fuero Juzgo*, and the Kearney Code, and it concludes that all formed an integral part of the civil law in the days before statehood and were incorporated into the New Mexico Constitution. Accordingly, NMTLA argues that the damage cap is subject to strict scrutiny under which it surely must be invalidated, but that even under the minimal rational basis analysis, no justification exists to uphold a limitation on the award of damages.

DLA, from an opposing position, argues that Richardson has no standing to raise the jury trial issue because she never requested a jury trial. On the issue of recoverable damages, it takes the stance that the legislature changed dramshop liability to a statutory action from one at common law and, thus, because it created the liability, it can limit the amount of recovery. We are urged to disregard the separation of powers, due process, and right of access to the

courts issues because they were not briefed or argued at trial and, therefore, are not properly before us for consideration. But DLA does respond to some of the amici arguments, urging that the separation of powers doctrine is inapplicable here because the judiciary promulgates procedural rules out of convenience and efficiency only; and the right of access to the courts merely refers to the availability of the judicial machinery to resolve disputes and is not a right guaranteed explicitly in the New Mexico Constitution.

Regarding the equal protection issue, DLA asserts that we are not here dealing with fundamental rights or suspect classes. Any rights found in the Kearney Code or any other civil law predating statehood, it says, were not adopted by or incorporated into the New Mexico Constitution. Moreover, characterizing the dramshop act as social and economic legislation reviewable by the rational basis test, it denies that any right to full compensation can be implied from the guarantee of certain inalienable rights in Article II, Section 4 of our constitution. DLA views the damage cap as rationally related to the dual legislative goals of compensating victims injured as the result of the negligent service or sale of alcohol but not overburdening tavernkeepers, conjecturing that recovery under the dramshop act probably will not be the only source of recovery available to such a plaintiff.

■ Responding to whether Richardson properly preserved certain constitutional issues for appeal, NMTLA points to Richardson's broad claim that the damage cap was unconstitutional, which opened the door for amici to explain in more detailed and specific analyses under the right to jury trial, due process, and equal protection clauses of the New Mexico Constitution, exactly why the statute is invalid. But DLA is correct in asserting that two of the issues, separation of powers and due process, cannot be raised for the first time on appeal. *See Romero v. Sanchez*, 86 N.M. 55, 56, 519 P.2d 291, 292 (1974) (court will not consider claim offered for first time on appeal); *State ex rel. Brown v. Hatley*, 80

N.M. 24, 25, 450 P.2d 624, 625 (1969) (same). It is not enough for a party to make a broad, general assertion that a statute is unconstitutional and then leave it to amici to develop and refine her arguments. The complainant must specify in what manner his or her constitutional rights are affected adversely. *State v. Hines*, 78 N.M. 471, 474, 432 P.2d 827, 830 (1967). Richardson did not request resolution, in either the trial court or the court of appeals, of the separation of powers and due process claims raised by NMTLA, and we will not consider new issues presented for the first time on appeal through amicus briefs. *St. Vincent Hosp. v. Salazar*, 95 N.M. 147, 149, 619 P.2d 823, 825 (1980).

■ DLA is likewise correct in observing that Richardson did not request a jury trial. Failure to demand a jury trial in a timely manner constitutes a waiver of a trial by jury. SCRA 1986, 1–038(D). Even though this issue was addressed by the court of appeals in its notices of proposed affirmance, we will not consider in this review the jury trial issue. We do not consider, therefore, whether the limit on dramshop liability violates Richardson's right to a jury's determination of damages in a common-law cause of action.

■ NMTLA, however, correctly analyzes right of access to the courts as an implicit fundamental right entitled to the equal protection guarantees of the Constitution. Richardson claimed an equal protection violation in the court below; consequently, whether a right of access to the courts is violated by the damage cap is a relevant question in determining whether a fundamental right is contravened. That, in turn, is likewise relevant in determining which standard of review to apply in analyzing the equal protection right guaranteed by Article II, Section 18 of the New Mexico Constitution.

■ Recently we discussed, in *Meyer v. Jones*, 106 N.M. 708, 749 P.2d 93 (1988), that in equal protection attacks upon statutes, at least three tests for reviewing such challenges have been recognized and applied. Traditionally, the United States Supreme Court long had employed a two-ti-

ered analysis: minimum scrutiny, or the rational basis test, when reviewing social and economic legislation, *McGowan v. Maryland,* 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed. 2d 393 (1961), and strict scrutiny when analyzing legislation that infringed fundamental constitutional rights or made distinctions directed toward suspect classes.[1] The tests for reviewing equal protection challenges generally are the same under New Mexico and federal law.[2]

We have observed that a statute infringing fundamental rights or involving suspect classes must support a compelling state interest to escape judicial invalidation. *State v. Edgington,* 99 N.M. 715, 718, 663 P.2d 374, 377 (Ct.App.), *cert. denied,* 99 N.M. 644, 662 P.2d 645, *cert. denied,* 464 U.S. 940, 104 S.Ct. 354, 78 L.Ed.2d 318 (1983). We have also said that legislative acts are presumptively valid and normally are subjected to the rational basis test; it is well-settled that they will not be declared invalid unless the court is clearly satisfied that the legislature went outside the constitution in enacting them. *Espanola Hous. Auth. v. Atencio,* 90 N.M. 787, 788, 568 P.2d 1233, 1234 (1977); *Board of Trustees v. Montano,* 82 N.M. 340, 343, 481 P.2d 702, 705 (1971). The burden of proof is on the plaintiff to demonstrate that the challenged legislation is clearly arbitrary and unreasonable, not just that it is possibly so. *Sanchez v. M.M. Sundt Constr. Co.,* 103 N.M. 294, 296, 706 P.2d 158, 160 (Ct.App. 1985); *Gallegos v. Homestake Mining Co.,* 97 N.M. 717, 722, 643 P.2d 281, 286 (Ct. App.1982). The fact that a statute appears unreasonable to the courts is not decisive; that is not enough to invalidate an act. *Hutcheson v. Atherton,* 44 N.M. 144, 149, 99 P.2d 462, 465 (1940). Only when a statutory classification is so devoid of rational support or serves no valid governmental interest, so that it amounts to mere caprice, will it be struck down under the rational basis test. *Montano,* 82 N.M. at 343, 481 P.2d at 705; *Hutcheson,* 44 N.M. at 149, 99 P.2d at 465; *Edgington,* 99 N.M. at 719, 663 P.2d at 378. When employing the minimal scrutiny test, the courts neither will inquire into the wisdom, policy, or justness of legislation, nor will they substitute their views for that of the legislature, but rather will uphold the statute if any state of facts reasonably can be conceived that will sustain the challenged classification. *Garcia v. Albuquerque Pub. Schools Bd. of Educ.,* 95 N.M. 391, 393, 622 P.2d 699, 701 (Ct. App.1980), *cert. quashed,* 95 N.M. 426, 622 P.2d 1046 (1981). The rational basis test, therefore, employs no independent review or analysis of the factual basis of the state's goal, or of the means designated by the statute to attain that goal. Nowak, *Realigning the Standards of Review Under the Equal Protection Guarantee—Prohibited, Neutral, and Permissive Classifications,* 62 Geo.L.J. 1071, 1094 (1974).

An intermediate equal protection standard of review, somewhere between the rational basis and strict scrutiny standards, arose more recently out of the Supreme Court's dissatisfaction with the traditional, two-tiered analysis. *See Craig v. Boren,* 429 U.S. 190, 210 n. *, 97 S.Ct. 451, 463 n. *, 50 L.Ed.2d 397 (1976) (Powell, J., concurring); Gunther, *In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection,* 86 Harv.L. Rev. 1, 17–19 (1972). Accordingly, the third test has been aimed at legislative classifications infringing important but not fundamental rights, and involving sensitive but not suspect classes. L. Tribe, *American Constitutional Law* § 16–33, at 1610, 1613 (2d ed. 1988). The Court first enunciated the intermediate (or "heightened scrutiny") test in *F.S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920), when it declared that a classification must be reasonable,

---

1. *See City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985); *see also Torres v. Village of Capitan,* 92 N.M. 64, 69, 582 P.2d 1277, 1282 (1978); *Vandolsen v. Constructors, Inc.,* 101 N.M. 109, 112, 678 P.2d 1184, 1187 (Ct.App.), *cert. denied,* 101 N.M. 77, 678 P.2d 705 (1984).

2. *Sanchez v. M.M. Sundt Constr. Co.,* 103 N.M. 294, 297, 706 P.2d 158, 161 (Ct.App.1985); *Garcia v. Albuquerque Pub. Schools Bd. of Educ.,* 95 N.M. 391, 393, 622 P.2d 699, 701 (Ct.App.1980), *cert. quashed,* 95 N.M. 426, 622 P.2d 1046 (1981).

not arbitrary, and must rest upon some ground of difference having a *fair and substantial relation* to the object of the legislation. *See Reed v. Reed*, 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971) (employing Royster's intermediate scrutiny test to invalidate statute based on gender classification); *see also City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 441, 105 S.Ct. 3249, 3255, 87 L.Ed.2d 313 (1985) (under heightened standard of review, classification fails unless it is substantially related to sufficiently important or legitimate governmental interest). The Court has applied the intermediate analysis principally to statutes that classify according to gender and illegitimacy. *See City of Cleburne*, 473 U.S. at 440–41, 105 S.Ct. at 3254–55.

Although we have referred to the Supreme Court's use of the third, intermediate standard of review, see *McGeehan v. Bunch*, 88 N.M. 308, 310, 540 P.2d 238, 240 (1975), on occasion we have muddied the constitutional waters in New Mexico by interchangeably using the rational basis and intermediate tests as if they were identical. For example, in *McGeehan*, the court considered the validity of an automobile guest statute, construed the act as social and economic legislation, and cited the applicable standard of review as the intermediate test that was enunciated in *Reed. See McGeehan*, 88 N.M. at 310, 540 P.2d at 240. The court described the facets of the rational basis test, declared the legislative classification unreasonable and arbitrary, *id.* at 311, 540 P.2d at 241, but said also that the statute had no "fair and substantial relation" to its goal. *Id.* at 313–14, 540 P.2d at 244. In the end, the court invalidated the guest statute as violative of the equal protection clause, but it is not clear on which standard of review it relied to do so; and if the court employed both the rational basis and intermediate tests to strike the statute, the opinion is not clear why the court used both instead of either.

The imprecision was perpetuated in *Pruey v. Department of Alcoholic Beverage Control*, 104 N.M. 10, 715 P.2d 458 (1986). In considering an equal protection challenge to regulations prohibiting the sale of alcohol on Sundays, the court quoted the rational basis test as outlined in *McGowan*, and then cited the intermediate test and *Reed* and *McGeehan* in support. *Id.* at 12, 715 P.2d at 460. The court seemed to consider the two tests as different manifestations of the same principle; but the court upheld the statute as having a rational basis. *Id.* at 13, 715 P.2d at 461.

The confusion probably is a result of a misinterpretation of the longstanding precedent that legislative classifications must be based upon substantial distinctions. *See State v. Atchison, T. & S.F. Ry.*, 20 N.M. 562, 570, 151 P. 305, 307 (1915). That rule is found in *Gruschus v. Bureau of Revenue*, 74 N.M. 775, 399 P.2d 105 (1965), an opinion often cited for its explication of the rational basis standard of review, wherein it was said that the equal protection clause "does not prohibit classification for legislative purposes, provided that there is a rational and natural basis therefor, that it is based on a substantial difference between those to whom it does and those to whom it does not apply * * *." *Id.* at 778, 399 P.2d at 107. In *Gruschus*, the challenged statute was found reasonable and not arbitrary, affording substantially equal treatment to all persons similarly situated. *Id.* at 779, 399 P.2d at 108. The test might better be stated as one assuring that classifications are based on *real* differences bearing a rational and proper relationship to the classification. *See Community Pub. Serv. Co. v. New Mexico Pub. Serv. Comm'n*, 76 N.M. 314, 317–18, 414 P.2d 675, 677, *cert denied*, 385 U.S. 933, 87 S.Ct. 292, 17 L.Ed. 2d 213 (1966); *Burch v. Foy*, 62 N.M. 219, 224, 308 P.2d 199, 202 (1957). The *Espanola Housing* court said that the question is whether the reasons advanced for validity of a statute were "real and pertinent differences or merely artificial differences * * * not relevant to the classification involved." 90 N.M. at 789, 568 P.2d at 1235.

Thus, the rational basis test, which requires classifications to be based on substantial or real distinctions and be rationally related to the legislative goal, is

different from the intermediate test, which requires a classification to be more than just rationally related to the statutory purpose; it requires also that the classification be substantially related to an important state interest. Additionally, a key difference in the tests is that under rational basis the party objecting to the legislative classification has the burden of demonstrating that the classification bears no rational relationship to a conceivable legislative purpose whereas under heightened scrutiny the party maintaining the validity of the classification must prove that the classification is substantially related to an important governmental interest. *See Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976).

Our research discloses that only the Supreme Court of Minnesota has considered the constitutionality of a limitation on damages for dramshop liability. Employing the rational basis test, *McGuire v. C & L Restaurant, Inc.*, 346 N.W.2d 605 (Minn. 1984), invalidated the liability limitations as violative of the state equal protection clause. *Id.* at 613. In similar challenges to medical malpractice damage caps, however, several jurisdictions have considered the equal protection argument. We have found those cases most instructive in that for all practical purposes the constitutional analysis of medical malpractice limited liability legislation is identical to an equal protection analysis of limited dramshop liability. Thus, we discuss some of those decisions.

Some courts have construed the damage caps as social and economic legislation and have upheld them after reviewing the legislation under the rational basis test.[3] Three

separate intermediate courts in Texas have invalidated legislation that limited liability for medical malpractice actions, purportedly using the rational basis standard of review.[4] The Supreme Court of Texas, also applying the minimum standard in a yet-unreleased opinion, recently affirmed the invalidity of the statutory liability limitation in *Lucas v. United States*, 757 S.W.2d 687 (1988), holding the cap to be "unreasonable *and* arbitrary" when balanced against the purpose and basis of the legislation. *Id.* at 690. In *Lucas*, the Texas Supreme Court had no difficulty in determining under the rational basis standard that an unreasonable and arbitrary cap on medical malpractice damages was an unconstitutional denial of a " 'remedy by due course of law.' " 757 S.W.2d at 690.

Three other jurisdictions have invalidated damage limitation provisions as violative of a plaintiff's explicit, state constitutional right to full recovery in a tort action, employing a strict scrutiny analysis to do so. *See Kenyon v. Hammer*, 142 Ariz. 69, 83, 688 P.2d 961, 975 (1984); *Smith v. Department of Ins.*, 507 So.2d 1080, 1088 (Fla. 1987); *Pfost v. State*, 713 P.2d 495, 503 (Mont.1985). Several other courts have held that the right to recover damages for personal injuries is not a fundamental right and that the class of victims denied full recovery is not a suspect class; but those courts have declared further that the rights infringed by medical malpractice legislation are sufficiently important and substantive, and the class of persons affected sufficiently sensitive, to justify invoking an intermediate standard of review to invalidate the statutes.[5]

---

3. *See, e.g., Lucas v. United States*, 807 F.2d 414, 422 (5th Cir.1986); *Hoffman v. United States*, 767 F.2d 1431, 1436–37 (9th Cir.1985); *Boyd v. Bulala*, 647 F.Supp. 781, 787 (W.D.Va.1986) (but holding that damage cap violates seventh amendment jury trial provision); *Fein v. Permanente Medical Group*, 38 Cal.3d 137, 162, 695 P.2d 665, 681, 211 Cal.Rptr. 368, 386 (1985), *appeal dismissed*, 474 U.S. 892, 106 S.Ct. 214, 88 L.Ed.2d 215 (1985); *Bernier v. Burris*, 113 Ill.2d 219, 228–29, 100 Ill.Dec. 585, 590, 497 N.E.2d 763, 768 (1986); *Johnson v. St. Vincent Hosp., Inc.*, 273 Ind. 374, 397, 404 N.E.2d 585, 601 (1980); *Prendergast v. Nelson*, 199 Neb. 97, 113–14, 256 N.W.2d 657, 669 (1977).

4. *See Detar Hosp., Inc. v. Estrada*, 694 S.W.2d 359 (Tex.Civ.App.1985); *Malone & Hyde, Inc. v. Hobrecht*, 685 S.W.2d 739 (Tex.Civ.App.1985); *Baptist Hosp. of Southeast Tex., Inc. v. Baber*, 672 S.W.2d 296, 298 (Tex.Civ.App.1984), *cert. denied*, 714 S.W.2d 310 (Tex.1986).

5. *See, e.g., Coburn v. Agustin*, 627 F.Supp. 983, 995 (D.Kan.1985); *Jones v. State Bd. of Medicine*, 97 Idaho 859, 871, 555 P.2d 399, 411 (1976), *cert. denied*, 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977); *Farley v. Engelken*, 241 Kan. 663, 672, 740 P.2d 1058, 1064 (1987); *Sibley v. Board of Supervisors of La. State Univ.*, 477 So.2d 1094, 1107 (La.1985); *Carson v. Maur-*

In determining which standard of review to apply in the equal protection analysis of the damage cap in the present case, we note first that no suspect class is involved. A suspect class has been defined as a discrete group "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973); *see Lyng v. Castillo*, 477 U.S. 635, 106 S.Ct. 2727, 2729, 91 L.Ed. 2d 527 (1986); *Plyler v. Doe*, 457 U.S. 202, 216 n. 14, 102 S.Ct. 2382, 2394 n. 14, 72 L.Ed.2d 786 (1982). Only statutory classifications based on race, national origin, or alienage so far have been treated as suspect. Wilkinson, *The Supreme Court, The Equal Protection Clause, and the Three Faces of Constitutional Equality*, 61 Va. L.Rev. 945, 951 (1975). The class of tort victims denied full recovery for dramshop liability does not rise to the level of "suspectness" under existing precedent and, therefore, does not trigger strict scrutiny.

Secondly, we address the question of whether the damage cap infringes upon any fundamental constitutional rights. A fundamental right is that which the Constitution explicitly or implicitly guarantees. *Rodriguez*, 411 U.S. at 33–34, 93 S.Ct. at 1296–1297. The petitioner and amicus NMTLA argue that the damage cap violates her right of access to the courts and her right to full recovery in tort. Neither of these "rights" is guaranteed explicitly in our constitution. We have declared, however, that the right of access to the courts is one aspect of the right to petition for redress of grievances, and we have acknowledged that right as one guaranteed by the first amendment to the federal constitution and also protected by both the United States and New Mexico Constitutions by the prohibitions against "depriving a person of life, liberty or property without due process of law." *Jiron v. Mahlab*, 99

er, 120 N.H. 925, 932, 424 A.2d 825, 830 (1980); *Arneson v. Olson*, 270 N.W.2d 125, 135 (N.D.

N.M. 425, 426, 659 P.2d 311, 312 (1983). We once again recognized a "plaintiff's constitutional right to petition for redress" in *Otero v. Zouhar*, 102 N.M. 482, 486, 697 P.2d 482, 486 (1985).

With regard to whether the right to full recovery reaches fundamental status, the argument is that Article II, Section 4 of the New Mexico Constitution guarantees a fundamental right to be compensated fully and adequately for injuries that result from negligent behavior. That provision reads: "All persons are born equally free, and have certain natural, inherent and inalienable rights, among which are the rights of enjoying and defending life and liberty, * * * and of seeking and obtaining safety and happiness." N.M. Const. art II, § 4. Some commentators assert that this is "textual evidence of an intent on the part of the constitutional ratifiers to afford substantive ·protection against the power of the state to impair economic interests." *Developments in The Law—The Interpretation of State Constitutional Rights*, 95 Harv.L.Rev. 1324, 1480 (1982). But because we do not think it necessary, we decline at this time to interpret this provision as implicitly guaranteeing a fundamental right to full recovery in tort actions, so as to trigger a strict scrutiny analysis.

Acknowledging, also, our recognition of a constitutional right of access to our courts, we do not apply strict scrutiny to the issue of full recovery, principally because we conclude that the damage cap is constitutionally invalid under the lesser, intermediate scrutiny test. It is thus unnecessary to impose the highest level of review.

We are aware that in the history of the interpretation of the federal equal protection clause, the rational basis test generally has been minimal scrutiny in theory and has amounted to virtual judicial abdication in fact, whereas maximum scrutiny has been strict in theory and almost always fatal in fact. Gunther, 86 Harv.L.Rev. at 8. Strict scrutiny has operated as an anti-

1978).

majoritarian safeguard. Tribe, § 16–31, at 1588; Learner, *Restrictive Medical Malpractice Compensation Schemes: A Constitutional "Quid Pro Quo" Analysis to Safeguard Individual Liberties*, 18 Harv. J. on Legis. 143, 152 (1981). Accordingly, the application of the strict scrutiny test has resulted in the virtual immunization of certain liberties from legislative affliction. "The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's * * * fundamental rights may not be submitted to vote; they depend on the outcome of no elections." *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943).

By contrast, the rational basis test affords minimal scrutiny because of the concept that "it is constitutionally appropriate to 'fight out the wise use of legislative authority in the forum of public opinion and before legislative assemblies rather than to transfer such a contest to the judicial arena,' since all the 'effective means of inducing political changes are left free.' " *Id.; see Cleburne*, 473 U.S. at 441–42, 105 S.Ct. at 3255–56 (because of doctrine of separation of powers, courts should be reluctant to closely scrutinize economic and social legislation, but rather should employ rational basis test). The primary theoretical basis for deferring to the legislature when applying the rational basis test, then, is that political entities can respond best to the electorate and can experiment with and allocate the state's often limited resources in a manner that best reflects the concerns of their constituencies over social and economic issues. *See* Redish, *Legislative Response to the Medical Malpractice Insurance Crisis: Constitutional Implications*, 55 Tex.L.Rev. 759, 761 (1977); Tussman & tenBroek, *The Equal Protection of the Laws*, 37 Calif.L.Rev. 341, 366 (1949). In our own jurisprudence, we also have observed that courts should be hesitant to overturn a statute other than on fundamental rights grounds because the separation of powers doctrine mandates deference to a legislative determination of reasonableness. *Edgington*, 99 N.M. at 718, 663 P.2d at 377.

In advancing the intermediate test as a third level of review, the Supreme Court has "recognized that certain forms of legislative classification, while not facially invidious, nonetheless give rise to recurring constitutional difficulties" and in those "limited circumstances" the Court seeks "assurance that the classification reflects a reasoned judgment consistent with the ideal of equal protection by inquiring whether it may fairly be viewed as furthering a substantial interest of the State." *Plyler*, 457 U.S. 202, 217–18, 102 S.Ct. 2382, 2395. And although even the Supreme Court has presented the heightened scrutiny test in a myriad of fashions, it has been characterized, in whatever form, at least by a "sharper focus" on legislative classifications "poised between the largely toothless invocation of minimum rationality and the nearly fatal invocation of strict scrutiny." Tribe, § 16–32, at 1601; *see Cleburne*, 473 U.S. at 451, 105 S.Ct. at 3260 (Stevens, J., concurring) (standards of review for equal protection challenges reflect "a continuum of judgmental responses to differing classifications which have been explained in opinions by terms ranging from 'strict scrutiny' at one extreme to 'rational basis' at the other").

Some critics have said that when courts elect to apply the intermediate test, they abandon judicial objectivity and make subjective judgments that lack constitutional support, thereby succumbing to the temptation to usurp the legislature's function by making highly political decisions about certain social and economic issues. *See, e.g.,* Redish, 55 Tex.L.Rev. at 782; Note, *Fein v. Permanente Medical Group: Future Trends in Damage Limitation Adjudication*, 80 Nw.U.L.Rev. 1643, 1663–64 & 1673 (1986). But judicial scrutiny always requires judgments about legislative decisions, and that is particularly so when heightened scrutiny is called for. *See Cleburne*, 473 U.S. at 443, 105 S.Ct. at 3256; *Coburn*, 627 F.Supp. at 991. *See generally* Haines, *General Observations on the*

*Effects of Personal, Political, and Economic Influences in the Decisions of Judges,* 17 Ill.L.Rev. 96, 112–14 (1922). We do not consider that the intermediate constitutional review process necessarily constitutes "abandonment" of any judicial responsibilities but, instead, hones the indispensable requirement of detached analytical examination of competing interests between legislative power and constitutional restraints.

To support our application of the intermediate test we are impressed with Professor Tribe's observation that the heightened, intermediate standard of review is a judicial response to an awareness that the

> all-or-nothing choice between minimum rationality and strict scrutiny ill-suits the broad range of situations arising under the equal protection clause, many of which are best dealt with neither through the virtual rubber-stamp of truly minimal review nor through the virtual death-blow of truly strict scrutiny, *but through methods more sensitive to risks of injustice than the former and yet less blind to the needs of governmental flexibility than the latter.* [Emphasis added.]

Tribe, § 16–32, at 1609–10; *see Cleburne,* 473 U.S. at 460, 105 S.Ct. at 3265 (Marshall, J., dissenting) ("level of scrutiny employed in an equal protection case should vary with 'the constitutional and societal importance of the interest adversely affected and the recognized invidiousness of the basis upon which the particular classification is drawn' "). We agree that implementing the intermediate test in appropriate circumstances narrows the wide gap between strict and minimal scrutiny, "not by abandoning the strict but by raising the level of the minimal from virtual abdication to genuine judicial inquiry." Gunther, 86 Harv.L. Rev. at 24.

It is clear from the foregoing discussion that the limitation of a full tort recovery at issue here under Section 41–11–1(I) implicates a substantial and important individual interest. For substantial and important individual interests, we invoke an intermediate standard of review because we think

it best strikes the balance between the legislature's constitutional prerogative to deliberate over and counterbalance the variety of interests involved in social and economic issues, and the judiciary's constitutional responsibility to strictly scrutinize legislation that either infringes upon fundamental rights or impacts upon suspect classes. Viewing this constitutional balance within the separation of powers context, which is the gist of opposition to it, we are satisfied that we neither trample arbitrarily upon the legislature's preferred position of direct, political accountability to the electorate, nor do we forsake our duty to protect individuals from the deleterious effects of controversial social and economic legislation that, in this case at least, could result in economic devastation of innocent victims simply by the fortuitous happenstance of the tortfeasor's status. We see no usurpation of power in a heightened scrutiny of legislation in those limited circumstances when the class implicated is so sensitive to injustice and the rights affected are so substantial and important that they warrant special judicial attention.

Section 41–11–1 tacitly makes three separate classifications: a class of victims suffering from injuries resulting from the negligence of a tavernkeeper as distinguished from victims of another tortfeasor's negligent conduct; a class of victims suffering from the negligence of tavernkeepers whose injuries amount to less than $50,000 lumped together with those victims whose injuries resulting from the same cause are in excess of that damage limitation; and a class of tortfeasors accorded the benefit of the $50,000 cap as distinguished from all other tortfeasors, most of whom are liable for the full amount of damages they cause. We believe that these classifications effect a substantial injustice in this case. The classifications infringe an individual's important interest to be compensated fully for his injuries, especially when, as is alleged in the instant case, they are a result of no fault of his own. This interest, in our view, certainly is amply important and substantial to justify the invocation of at least the heightened, intermediate test instead of the minimum rationality test. We are per-

suaded also that the class of tort victims affected by the damage cap is "sensitive" enough to the injustice wrought to warrant applying the heightened test. Consequently, we take the intermediate approach and analyze the constitutional challenge in this case under heightened scrutiny.

■ We commence our examination by repeating that the court of appeals erred in its equal protection analysis of the damage limitation. A legislative classification not only must affect equally all persons within the class to which the legislation applies but, to begin with, the legislature must have a legitimate purpose for creating the class, and a constitutionally permissible reason for treating persons within that class differently from those without. *See McLaughlin v. Florida,* 379 U.S. 184, 190, 85 S.Ct. 283, 287, 13 L.Ed.2d 222 (1964). In light of those considerations, the court of appeals erred in concluding that the damage cap did not violate the equal protection clause because it applied equally to all persons affected by the dramshop act. "Judicial inquiry under the Equal Protection Clause * * * does not end with a showing of equal application among the members of the class defined by the legislation." *Id.* at 191, 85 S.Ct. at 288. No argument has been presented to us to persuade us that the classifications created by the legislation are constitutionally legitimate and, under the *McLaughlin* dictate, we have been unable to discern or discover any by our own reasoning processes.

■ Plaintiff has presented a prima facie showing of an arbitrary and unreasonable denial of equal protection and of a restriction on a plaintiff's right of access to the courts. On the other hand, respondent completely failed to carry its burden of demonstrating that any substantial interest of the state is furthered by the legislation. In the absence of any contrary showing by respondent, we cannot think of legitimate public good or supportive policy reasons that are promoted by the special protection of tavernkeepers in the dispensation of intoxicating liquor. We are distinctly unable to rationalize a legitimate or substantial reason for limiting the liability of a tavernkeeper who has a duty not to place drunks behind the wheel of a vehicle on the highway when, by contrast, a rancher or farmer is fully liable for negligently allowing his livestock to meander dumbly into the path of oncoming vehicles. *See* NMSA 1978, §§ 30–8–13 (Repl.Pamp.1984) & 66–7–363 (Repl.Pamp.1987).

Even though we agree that the legislature most often is better suited to make such policy determinations, a heightened scrutiny of legislation that infringes substantial and important individual interests, such as we have here, compels us to the conviction that the liability cap works a manifest injustice on innocent tort victims and lacks any of the redeeming features entitling it to constitutional validity. Absolutely nothing was shown sufficient to overcome plaintiff's arguments, or to demonstrate that the damage limitation in Section 41–11–1(I) has a substantial relationship to a legitimate or important governmental purpose and we have been unable to fathom one. The cap on damages mandated by Section 41–11–1(I) simply does not withstand heightened scrutiny, and we hold it to be constitutionally invalid as violative of the equal protection clause.

■ Turning to the other issue, we acknowledge that, as in *Bouldin v. Sategna,* 71 N.M. 329, 378 P.2d 370 (1963), a substantial number of courts has not held owners liable for leaving the keys in their unattended vehicles and for the injuries to third persons as a result of the thefts and subsequent negligent operation of those vehicles. Those courts have concluded either that an owner owes no duty to the general public to guard against the risk of a thief's negligent operation of a vehicle in which the owner left his keys; that the theft and subsequent negligence of the thief could not reasonably be foreseen by the owner as a natural or probable consequence of leaving the keys in the ignition of the car; or have concluded that even if the owner was negligent, his actions were not the proximate cause of the injuries because the

thief's actions constituted an independent, intervening cause.[6]

An emerging group of jurisdictions, on the other hand, has rejected the contention that an intervening criminal act automatically breaks the chain of causation as a matter of law, concluding instead that a reasonable person could foresee a theft of an automobile left unattended with the keys in the ignition and reasonably could foresee the increased risk to the public should the theft occur.[7] In addition, a few courts, including some of those that earlier denied liability, have indicated a willingness to impose liability upon the owner under "special circumstances."[8] Courts looking at special circumstances seek to determine whether an owner's conduct enhanced the probability that his car would be stolen and thus increased the hazard to third persons. Considering special circumstances, then, is just another way of examining the degree of foreseeability of injury and whether the owner is subject to a duty to exercise reasonable care.[9] *Vadala v. Henkels & McCoy, Inc.*, 397 A.2d 1381 (Del.Super. 1979), listed some of the circumstances aiding the court in its resolution of a similar case:

(a) the vehicle in question is of a type which may attract potential intermeddlers who are unlikely to have the necessary knowledge and skill to operate it safely;

(b) that vehicle is capable of inflicting more serious injury and damage than an ordinary vehicle when not properly controlled;

(c) no security measures were taken after it became evident that the lock which secures the gate to the truck yard had been partially cut and an

6. *See Vines v. Plantation Motor Lodge*, 336 So.2d 1338, 1340 (Ala.1976); *Bennett v. Artic Insulation, Inc.*, 253 F.2d 652, 654 (9th Cir.1958); *Richards v. Stanley*, 43 Cal.2d 60, 65, 271 P.2d 23, 26–27 (1954); *Lambotte v. Payton*, 147 Colo. 207, 209, 363 P.2d 167, 168 (1961); *Gamble v. Kinch*, 102 Idaho 335, 337, 629 P.2d 1168, 1170 (1981); *Dillner v. Maudlin*, 161 Ind.App. 204, 205, 314 N.E.2d 794 (1974); *Roadway Express, Inc. v. Piekenbrock*, 306 N.W.2d 784, 786 (Iowa 1981); *Roach v. Liberty Mut. Ins. Co.*, 279 So.2d 775, 777 (La.Ct.App.), *cert. denied*, 281 So.2d 756 (La.1973); *Berluchaux v. Employers Mut. of Wausau*, 194 So.2d 463, 465 (La.Ct.App.), *cert. denied*, 250 La. 533, 197 So.2d 79 (1967); *Galbraith v. Levin*, 323 Mass. 255, 259, 81 N.E.2d 560, 563–64 (1948); *Permenter v. Milner Chevrolet Co.*, 229 Miss. 385, 404, 91 So.2d 243, 252 (1956); *Dix v. Motor Mkt., Inc.*, 540 S.W.2d 927, 932–33 (Mo.Ct.App.1976); *Flannery v. Sample Hart Motor Co.*, 194 Neb. 244, 248, 231 N.W.2d 339, 342 (1975); *Pendrey v. Barnes*, 18 Ohio St.3d 27, 29, 479 N.E.2d 283 (1985); *Felty v. City of Lawton*, 578 P.2d 757, 760 (Okla.1977); *Liney v. Chestnut Motors, Inc.*, 421 Pa. 26, 28, 218 A.2d 336, 338 (1966); *Keefe v. McArdle*, 109 R.I. 90, 92, 280 A.2d 328, 329 (1971); *Stone v. Bethea*, 251 S.C. 157, 164, 161 S.E.2d 171, 174–75 (1968); *Parker v. Charlie Kittle Pontiac Co.*, 495 S.W.2d 810, 812 (Tenn.1973); *Pratt v. Thomas*, 80 Wash. 2d 117, 119, 491 P.2d 1285, 1286 (1971); *Meihost v. Meihost*, 29 Wis.2d 537, 546, 139 N.W.2d 116, 121 (1966).

7. *See Gaither v. Myers*, 404 F.2d 216, 221 (D.C. Cir.1968); *Ross v. Hartman*, 139 F.2d 14, 16 (D.C.Cir.1943), *cert. denied*, 321 U.S. 790, 64 S.Ct. 790, 88 L.Ed. 1080 (1944); *Vadala v. Henk-*

els & McCoy, Inc.*, 397 A.2d 1381, 1383–84 (Del. Super.1979); *Vining v. Avis Rent–A–Car Systems, Inc.*, 354 So.2d 54, 56 (Fla.1977); *Kacena v. George W. Bowers Co.*, 63 Ill.App.2d 27, 39, 211 N.E.2d 563, 569 (1965); *Davis v. Thornton*, 384 Mich. 138, 146, 180 N.W.2d 11, 15 (1970); *Zinck v. Whelan*, 120 N.J.Super 432, 445, 294 A.2d 727, 733–34 (1972); *Itami v. Burch*, 59 Or.App. 400, 402, 650 P.2d 1092, 1093 (1982).

8. *See Palma v. United States Indus. Fasteners, Inc.*, 36 Cal.3d 171, 185, 681 P.2d 893, 902, 203 Cal.Rptr. 626, 634 (1984); *Smith v. Shaffer*, 395 N.W.2d 853, 856 (Iowa 1986); *Illinois Farmers Ins. Co. v. Tapemark Co.*, 273 N.W.2d 630, 635 (Minn.1978); *Dix v. Motor Mkt., Inc.*, 540 S.W. 2d 927, 932 (Mo.Ct.App.1976); *Felty v. City of Lawton*, 578 P.2d 757, 761 (Okla.1977).

9. *See Hosking v. Robles*, 98 Cal.App.3d 98, 102–03, 159 Cal.Rptr. 369, 372 (1979) (surveying what constitutes "special circumstances" in California); *Smith v. Shaffer*, 395 N.W.2d 853, 856 (Iowa 1986) (leaving keys in unattended car's ignition in high crime area near several bars constitutes special circumstances); *State Farm Mut. Auto. Ins. Co. v. Grain Belt Breweries, Inc.*, 309 Minn. 376, 381, 245 N.W.2d 186, 189 (1976) (same); *Lavo v. Medlin*, 705 S.W.2d 562, 564 (Mo.Ct.App.1986) (implying that special circumstances include parking unusually dangerous vehicle in high crime area with keys in ignition); *Zinck v. Whelan*, 120 N.J.Super. 432, 450, 294 A.2d 727, 736 (1972) (special circumstances are position and location of parked vehicle, access thereto, its operational condition, proximity to surveillance, and length of time elapsing from theft to accident).

intoxicated individual was loitering nearby. * * *

*Id.* at 1383.

NMSA 1978, Section 66-7-353, which prohibits leaving a motor vehicle to stand unattended without "first stopping the engine, locking the ignition, [and] removing the key," was enacted for the purpose of promoting public welfare and safety. *Bouldin*, 77 N.M. at 332, 378 P.2d at 372. Prevention of the kinds of unfortunate circumstances that occurred in this case from failure to comply with the statute would be conducive to promoting public safety. When "a person by his own negligence produces a dangerous condition of things, which does not become active for mischief until another person has operated upon it by the commission of another negligent act, which might not unreasonably be foreseen to occur, the original act of negligence is then regarded as [a] proximate cause of the injury which finally results." *Thompson v. Anderman*, 59 N.M. 400, 412, 285 P.2d 507, 515 (1955).

Some of the members of this Court believe that our adoption of comparative negligence as the rule of law in this jurisdiction, *Scott v. Rizzo*, 96 N.M. 682, 634 P.2d 1234 (1981), commits us to the principles there expressed that if a jury finds more than one party to have been negligent, a verdict "requiring wrongdoers to share the losses caused, at the ratio of their respective wrongdoing, * * * fairly distributes the burden of fault" and "holds all parties fully responsible for their own respective acts to the degree that those acts have caused harm." *Id.* at 689-90, 634 P.2d at 1241-42. *See, e.g., St. Sauver v. New Mexico Peterbilt, Inc.*, 101 N.M. 84, 87, 678 P.2d 712, 715 (1984); *Ramirez v. Armstrong*, 100 N.M. 538, 542-43, 673 P.2d 822, 827-28 (1983); *Bartlett v. New Mexico Welding Supply, Inc.*, 98 N.M. 152, 158-59, 646 P.2d 579, 585-86 (Ct.App.), *cert. denied*, 98 N.M. 336, 648 P.2d 794 (1982). There is a divergence in the opinions of members of this Court, however, whether questions of fact are presented in any inquiry into whether an owner reasonably could foresee that his vehicle might be stolen if he left it unattended, unlocked, and with the keys in its ignition, and whether he reasonably could anticipate that the thief might drive negligently and injure someone, *see Ney v. Yellow Cab Co.*, 2 Ill.2d 74, 83, 117 N.E.2d 74, 80 (1954), or whether *Bouldin* was correct in holding, as a matter of law, that such ensuing theft and subsequent negligence resulting in injury were not natural, foreseeable events attendant upon leaving one's keys in the vehicle.

Consequently, a majority of the Court being unable to reach agreement on the *Bouldin* issue at this time, we do not disturb the summary judgment entered by the trial court in favor of Bennett-Cathey.

We remand the case to the district court for entry of judgment in the amount of $250,000 against defendant Carnegie. IT IS SO ORDERED.

SOSA, Senior Justice, concurs.

RANSOM, J., specially concurring.

STOWERS, J., dissenting.

SCARBOROUGH, C.J., not participating.

**RANSOM, Justice (specially concurring).**

Access to the courts is the implicit and universal constitutional right of persons seeking a remedy for harm caused by others. Access is conditioned only upon existence of some breach of duty that gives rise to a cause of action recognized at law. I agree that full tort recovery under this right is a substantial and important individual interest.

In 1966, *Hall* [1] held there was no recognition of a tavernkeeper's liability at common law. In 1977, *Marchiondo* [2] noted it would not be improper for the court to address the issue in the absence of legislative action. In 1982, changing what it characterized as an outmoded and unjust rule of law,

---

1. *Hall v. Budagher*, 76 N.M. 591, 417 P.2d 71 (1966).

2. *Marchiondo v. Roper*, 90 N.M. 367, 563 P.2d 1160 (1977).

the *Lopez*[3] court followed those states which, by reason of their legislature's failure to act, have imposed tavernkeeper's liability under common-law negligence principles. In doing so, *Lopez* recognized statutory or regulatory duties of a tavernkeeper to refrain from serving an obviously intoxicated person. In 1986, the legislature capped the tavernkeeper's liability at $50,000.

I agree that the substantial individual interest in full tort recovery requires a substantial state interest before the former may be altered for any class of persons. I concur in this Court's adoption of the intermediate scrutiny test for review of this equal protection issue.

I further agree that, on its face, there is discernable from the legislation no substantial or important governmental interest in selecting for limited tort recovery the more seriously injured victims of persons wrongfully served alcoholic beverages; nor any such interest in selecting for special protection those tavernkeepers who sell alcoholic beverages to persons known to be intoxicated.

This case does not demonstrate, however, that a substantial state interest might not have been shown if the defendant had pressed forward responsibly with the burden enunciated by this Court today. *See Jones v. State Bd. of Medicine*, 97 Idaho 859, 871–74, 555 P.2d 399, 411–14 (1976) (remanding for full development of record as to any real crisis for the Idaho health care industry to which a cap on medical malpractice recoveries may bear a fair and substantial relationship), *cert. denied*, 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977). Here, there is no record. The party with the burden of showing a substantial state interest in limited tort recovery against tavernkeepers stood mute, in default.

While I would be dissatisfied with anecdotal evidence and speculative argument about the impact of full tort recovery in New Mexico, I can fathom the production of evidence from which might be found a real crisis to those affected industries in whose welfare this state has an important governmental interest. Consequently, I would apply the holding of this case to the defaulting defendant alone, and I would reserve for future decision, on a fully developed record, whether unconstitutionality of limited tort recovery has universal application against tavernkeepers.

STOWERS, Justice (dissenting).

I respectfully disagree with the majority's holding on the "damage cap" issue and its reasoning on the liability of defendant, Bennett–Cathey, Inc. I believe the rational basis test is the appropriate standard of review of the "damage cap" mandated by NMSA 1978, Section 41–11–1(I) (Repl. Pamp.1986), the statute is rationally related to a legitimate state purpose and does not violate the Equal Protection Clause of the United States and New Mexico Constitutions. A careful examination of the statute, as set forth below, reveals that there is no constitutional violation. Although I agree with the majority that summary judgment was properly granted in favor of Bennett–Cathey, I cannot agree with the reasoning espoused in that opinion. Any negligence by Bennett–Cathey, in leaving the keys in the ignition, was not the proximate cause of the decedent's injuries. The theft of the truck by Lewis was a sufficient intervening or superseding cause to sever the chain of causation as it pertains to Bennett–Cathey.

In New Mexico the early common law did not permit an action against a liquor vendor for injuries resulting from the vendor's illegal sale of intoxicating liquor. *Lopez v. Maez*, 98 N.M. 625, 628, 651 P.2d 1269, 1272 (1982). Reasons generally given for this rule were that the proximate cause of the injury was not the furnishing of the liquor, but the drinking of it; and if the sale or service of liquor was found to have caused the patron's intoxication, then the later injury to a third person was thought to be an unforeseeable result of the furnishment of the liquor. *Id.*

---

**3.** *Lopez v. Maez,* 98 N.M. 625, 651 P.2d 1269 (1982).

The common law rule, a judicially created doctrine, was changed in a number of jurisdictions subjecting the tavernkeeper to liability where the injury to a third party resulted from the tavernkeeper's sale of intoxicating liquor to an inebriated customer. *Id.* at 629–30, 651 P.2d at 1273–74. New Mexico made this change in *Lopez* when we held therein that a person may be subject to liability if he or she breaches his or her duty by violating a statute or regulation which prohibits the selling or serving of alcoholic liquor to an intoxicated person, and the breach is the proximate cause of injuries to a third party. *Id.* at 630, 651 P.2d at 1274.

As a result of the decisional law, the legislature enacted in 1983, the dramshop act entitled: "Relating to Alcoholic Beverages; Limiting Civil Liability in Sales of Alcoholic Beverages or Serving of Alcoholic Beverages to Guests." 1983 N.M.Laws, ch. 328, § 1. "The title and entire tenor of the statute represents a legislative intent to narrow the scope of tavernkeeper and social host liability," *and* the statute was an obvious response to *Lopez. Trujillo v. Trujillo,* 104 N.M. 379, 383, 721 P.2d 1310, 1314 (Ct.App.), *cert. denied,* 104 N.M. 289, 720 P.2d 708 (1986). From then on all tort actions against tavernkeepers for the sale or service of alcoholic beverages were governed by the dramshop act.

The "damage cap" provision, at issue here, was first inserted in the dramshop act in 1986. 1986 N.M.Laws, ch. 100, § 1. It provides as follows:

> Liability arising under this section shall not exceed fifty thousand dollars ($50,-000) for bodily injury to or death of one person in each transaction or occurrence or, subject to that limitation for one person, one hundred thousand dollars ($100,-000) for bodily injury to or death of two or more persons in each transaction or occurrence, and twenty thousand dollars ($20,000) for property damage in each transaction or occurrence.

§ 41–11–1(I). The statute, as the majority opinion correctly points out, bears a presumption in favor of constitutionality. The onus is on the party challenging the statute to prove beyond a reasonable doubt that the statute violates a provision of the constitution. We must always proceed with extreme caution before declaring any statute unconstitutional. *Board of Trustees of Las Vegas v. Montano,* 82 N.M. 340, 343, 481 P.2d 702, 705 (1971).

I am of the opinion that the "damage cap" on recovery from a tavernkeeper is a valid legislative enactment in the public interest and it applies equally to all persons seeking recovery under the dramshop act. The appropriate standard of review for an Equal Protection Clause challenge is the rational basis test and not the intermediate test applied in the majority opinion, since we are neither dealing with a suspect class nor a fundamental right, but instead, reviewing social and economic legislation. *See Meyer v. Jones,* 106 N.M. 708, 749 P.2d 93 (1988). *The intermediate test is not used except to analyze statutes that classify according to gender or illegitimacy as the majority notes;* it is generally inapplicable when reviewing economic or social legislation. *City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 440–41, 105 S.Ct. 3249, 3254–55, 87 L.Ed.2d 313 (1984); *see also Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) and *Mathews v. Lucas,* 427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976). What is required by the Equal Protection Clause is that similarly situated persons be treated alike. Therefore, I am not persuaded that the intermediate test should be adopted in New Mexico in analyzing economic or social statutes.

In applying the rational basis test to the "damage cap" provision, the statute must be upheld if it serves a legitimate state goal. *See McGowan v. Maryland,* 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). "In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because classifications made by its laws are imperfect", and, "[i]f the classification has some 'reasonable basis', it does not offend the Constitution simply because the classification 'is not made with mathematical nicety' " or because in practice the results are not always uniform. *Dandridge v.*

*Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970). The "[legislature's] judgment is entitled to great weight when the matter comes before the courts for determination" and "[p]alpable error in its conclusion must appear before the courts will reject [the] same." *Hutcheson v. Atherton,* 44 N.M. 144, 153, 99 P.2d 462, 468 (1940). A legitimate legislative objective is being furthered by the "damage cap" provision. It compensates victims injured as a result of the negligent sale or service of alcohol without overburdening tavernkeepers. The enactment was, and appears to be to me, in the public interest.

As to the second issue, I agree only with the result reached by the majority, but not with its reasoning. Summary judgment was properly granted in favor of defendant-truck owner, Bennett–Cathey. The theft of the truck was a sufficient superseding cause, as a matter of law, to absolve the owner from responsibility for decedent's injuries. The weight of authority, which the majority opinion has chosen not to follow, supports the view that an accident caused by an intermeddler, who was enabled to misappropriate a vehicle by the owner's having left the vehicle unattended and the key in the ignition, will not create liability for the owner. *See* Annotation, *Liability of Motorist who Left Key in Ignition for Damage or Injury Caused by Stranger Operating the Vehicle,* 45 A.L.R. 3d 787 (1972); *Restatement (Second) of Torts* § 302B comment d, illustration 2 (1965). I believe that the law followed by a majority of the jurisdictions is correct.

Bennett–Cathey left the keys in the ignition of the unattended truck in violation of NMSA 1978, Section 66–7–353 (Repl.Pamp. 1987). In New Mexico violation of that statute is negligence per se. *Bouldin v. Sategna,* 71 N.M. 329, 332, 378 P.2d 370, 372 (1963). But a violation of the statute alone does not constitute actionable negligence. Once it has been determined that a defendant was negligent and a third party suffered injuries, it must be determined whether those injuries were caused by the defendant's wrongful conduct. A defendant may be held responsible for injurious consequences of his negligent act or omission which occur naturally and directly, without reference to whether defendant anticipated, or reasonably might have foreseen such consequences. The general rule —that an intervening, independent, and efficient cause severs whatever connection there may be between a third party's injuries and a defendant's negligence is controlling if the intervening act was not reasonably foreseeable. *See* Annotation, 45 A.L.R.3d 787 (1972).

To hold Bennett–Cathey liable would require it to have anticipated not one but two probable consequences as a result of having left the keys in the truck. While the theft may have been anticipatable or foreseeable, the subsequent negligent use of the vehicle to injure a third party was not. Leaving the keys in the ignition of an unattended vehicle merely furnished the condition by which the injuries to decedent were made possible. A subsequent independent act, the negligent driving of the stolen truck by Lewis, caused the injuries. Thus, the acts by Lewis, after the vehicle had been stolen, were a sufficient intervening or superseding cause to break the chain of causation with respect to Bennett–Cathey.

For these reasons, I dissent.

763 P.2d 1169

**John E. EDWARDS and Jean M. Edwards, his wife, Plaintiffs–Appellees,**

v.

**Robert J. MESCH and Florence M. Mesch, his wife, Defendants–Appellants.**

**No. 17599.**

Supreme Court of New Mexico.

Nov. 2, 1988.

David D. Johnson, Albuquerque, for defendants-appellants.

Lynch & Printz, Will Jeffrey, Albuquerque, for plaintiffs-appellees.

## OPINION

SCARBOROUGH, Chief Justice.

Defendants-appellants, Robert J. and Florence M. Mesch (Mesches), executed a promissory note in favor of plaintiffs-appellees, John E. and Jean M. Edwards (Ed-

wards), as payees on March 14, 1986. The promissory note for the amount of $6,000.00 with interest at the rate of 10% per annum on the balance was for money the Edwards had loaned to the Mesches. The Mesches subsequently defaulted on the note after making a single payment, and the Edwards brought suit to collect all unpaid principal and accrued interest. After a trial on the merits on November 11, 1987, the district court entered judgment for the Edwards in the sum of $6,751.10, with interest on the principal balance accruing at the rate of 10% per annum, and awarded attorney's fees and costs to the Edwards. We affirm.

On appeal the Mesches argue that the Edwards have no enforceable rights in the note and were not the real party in interest at the time of the trial. During the trial the Edwards did not deny assigning their interests in the note to the Tres Santos Corp., a closely held corporation, 100% of whose shares are owned by plaintiff-appellee, John E. Edwards. The Mesches argued at trial, and again on appeal, that since the Edwards assigned their interests in the note to the Tres Santos Corp., it became the real party in interest, and thus an indispensable party to the lawsuit. This argument finds no support in legal authority.

The promissory note which the Mesches executed to the Edwards is a negotiable instrument, and as such is governed by the Uniform Commercial Code (UCC). *See* NMSA 1978, § 55-3-104. According to the UCC, a "holder" of a negotiable instrument is "a person who is in possession of * * * an instrument * * * drawn, issued or indorsed to him or to his order or to bearer or in blank." NMSA 1978, § 55-1-201(20) (Orig.Pamp. & Cum. Supp.1988). Before a person can become a "holder", "[t]wo conditions must be satisfied * * * (1) the obligation evidenced by the instrument must run to him and (2) he must have possession of the instrument." 4 W. Hawkland & L. Lawrence, *Uniform Commercial Code Series* § 3-301:05 (1982). A negotiable instrument payee (the Edwards) is always a holder if the payee

has the instrument in his possession because the payee is the person to whom the instrument was issued. "It is inherent in the character of negotiable paper that any person in possession of an instrument which by its terms runs to him is a holder, and that anyone may deal with him as a holder." NMSA 1978, § 55–3–207 Official Comment 2. *See* Dugan, *A New Approach to "Holder" Conundrums Under Article 3 of the Uniform Commercial Code—A Reply to Professor White*, 13 B.C.Indus. & Com.L.Rev. 1, 9 n. 34 (1971).

The rights of a holder of a promissory note were discussed by this court as early as *Leitensdorfer v. Webb*, 1 N.M. 34, 51 (1853), *aff'd*, 61 U.S. (20 How.) 176, 15 L.Ed. 891 (1857). The Edwards in their argument on appeal rely on two later decisions, *Tompkins v. Rains*, 26 N.M. 631, 195 P. 800 (1921) and *Spears v. Sutherland*, 37 N.M. 356, 23 P.2d 622 (1933), wherein this court discussed the rights of payees when seeking payment on a note. In *Tompkins* we held that when a payee had possession of a note at trial, even if the note bore the indorsement of payee to a third party, "[t]he general rule is that in such instances the payee in the note is presumed to be the owner thereof and may maintain the suit." *Tompkins*, 26 N.M. at 633, 195 P. at 800–01. Given the definition of "holder" in the UCC discussed above, it is evident the rule in *Tompkins* was not disturbed by the passage of the UCC. In *Spears* the facts were similar to the instant case. Spears had brought suit to recover on two promissory notes on which he was payee and admitted at trial that the notes probably belonged to a "Spears & Co." which was almost entirely owned by Spears. Upon motion by Sutherland the district court dismissed the case on the grounds that Spears was not the real party in interest. Spears appealed, and we reversed, holding that "[t]he appellant was the payee and in possession of the notes, and could and did sue in his own name as the real party in interest * * *. The appellee was completely protected if judgment [were] entered against him and could not again be exposed to a second action." *Spears*, 37 N.M. at 357, 23 P.2d at 622 (citations omitted).

■ The Edwards were payees and holders of the note and could enforce payment of the note after they had assigned it to the Tres Santos Corp. "The holder of an instrument *whether or not he is the owner* may * * * enforce payment in his own name." NMSA 1978, § 55–3–301 (emphasis added). *See Brock v. Adams*, 79 N.M. 17, 21, 439 P.2d 234, 238 (1968). The Mesches' argument on appeal that the district court ruling exposes them to double liability is without merit. "The liability of any party is discharged to the extent of his payment or satisfaction to the holder even though it is made with knowledge of a claim of another person to the instrument * * . * ." NMSA 1978, § 55–3–603(1). Several exceptions to the discharge of liability by payment to a holder are set forth in Section 55–3–603, including bad faith and theft, but none of the exceptions apply in the instant case.

■ Rule 1–017 of Civil Procedure for the District Courts requires that "[e]very action shall be prosecuted in the name of the real party in interest * * *. The capacity of an individual * * * to sue or be sued shall be determined by the law of this state." SCRA 1986, 1–017(A) & (B). This court has held that the test for determining who is the real party in interest is "whether one is the owner of the right being enforced and is in a position to discharge the defendant from the liability being asserted in the suit." *L.R. Property Management, Inc. v. Grebe*, 96 N.M. 22, 23, 627 P.2d 864, 865 (1981) (quoting *Jesko v. Stauffer Chemical Co.*, 89 N.M. 786, 790, 558 P.2d 55, 59 (Ct.App.1976)). The Edwards in the instant case were the holders and payees on the promissory note and properly asserted their rights as plaintiffs at trial under NMSA 1978, Sections 55–3–104, 55–1–201(20), and 55–3–301. Furthermore, the Edwards were in a position at trial to discharge the Mesches from all liabilities to any third party from the promissory note. NMSA 1978, § 55–3–603(1). Therefore, the arguments that the Tres Santos Corp. was the real party in interest and an indispensable party at trial are without merit.

■ A review of the record below reveals the district judge expended commendable effort to explain the governing principles of law and his rulings in the instant case to the Mesches. We uphold the decision of the district court, and further hold that since the promissory note provides for costs and attorney's fees to payees for collection and enforcement of the note, the Edwards are entitled to recover reasonable attorney's fees on appeal. *See* SCRA 1986, 12–403. The judgment rendered by the district court is affirmed, and the cause is remanded to the district court solely to determine reasonable attorney's fees for the Edwards on appeal and to amend the judgment accordingly.

IT IS SO ORDERED.

SOSA, Senior Justice, and STOWERS, J., concur.

763 P.2d 1172

**Jere CORLETT, Personal Representative of the Estate of Harry S. Bishop, Deceased, Plaintiff–Appellee,**

v.

**Larry SMITH, Personal Representative of the Estate of Hadroudj Djeandi Bishop, Deceased, Defendant–Appellant.**

**Nos. 8766, 10309.**

Court of Appeals of New Mexico.

July 26, 1988.

James E. Thomson, Santa Fe, for plaintiff-appellee.

Carl J. Butkus, Terry R. Guebert, Civerolo, Hansen & Wolf, P.A., Albuquerque, for defendant-appellant.

## OPINION

MINZNER, Judge.

Defendant Larry Smith (Smith), personal representative of the estate of Hadroudj Bishop (wife), originally appealed a jury award of $93,000 for wrongful death in favor of plaintiff Jere Corlett (Corlett), personal representative of the estate of Harry S. Bishop (husband). *See Corlett v. Smith*, 106 N.M. 207, 740 P.2d 1191 (Ct.App.1987). The complaint for wrongful death alleged that wife negligently operated her motor vehicle in the garage of the residence and that carbon monoxide traveled into the bedroom where husband was sleeping, causing his death.

BACKGROUND.

Prior to trial, Smith moved to dismiss the complaint, alleging the claim had not been properly presented within the time limits established by NMSA 1978, Section 45–3–803. At the hearing on that motion, no record was made. The trial court denied the motion.

In our prior opinion, we concluded that Corlett bore the burden of establishing the timely presentation of his claim. Because there was no record, it was not established whether the claim ultimately depended upon the existence of liability insurance, including either a household policy or automobile insurance policy insuring against the negligence of wife. The trial court's order denying Smith's motion to dismiss did not disclose the basis for the decision. After oral argument, this court issued a formal opinion remanding the case for a determination of whether "specific insurance protection exists so as to bring the wrongful death claim of husband's estate within the statutory exception contained in [NMSA 1978,] Section 45–3–803(C)(2)." *See Corlett v. Smith,* 106 N.M. at 211, 740 P.2d at 1195.

Although we ordered the trial court to enter an amended judgment, a more appropriate procedure would have been to remand only for additional findings of fact. *See Russell v. University of N.M. Hosp./BCMC,* 106 N.M. 190, 740 P.2d 1174 (Ct.App.1987). In substance, there is only one appeal.

On remand, the trial court filed amended findings and conclusions and entered an amended judgment in favor of Corlett. Specifically, the trial court found:

4. On the date of death and for all material time prior, for the purpose of this action, there were two existing policies of insurance * * * that contained provisions for the protection of [wife] against claims for bodily injury under the liability portions of each policy. Both policies of insurance were in effect at the time of death of [husband].

5. Each * * * had limits of liability for damages up to $300,000.00.

The court concluded that "[s]pecific insurance protection exist[ed] so as to bring the wrongful death claim of [husband] within the statutory exception contained in Section 45–3–803(C)(2)."

By order of this court, Smith filed a second notice of appeal from the amended judgment. We consolidate both appeals, and we affirm.

ISSUES.

In the original appeal, Smith raised six issues. Smith argued that:

I. The trial court lacked subject matter jurisdiction because Corlett failed to comply with Section 45–3–803, which requires timely filing of all claims made against an estate;

II. Corlett was required by NMSA 1978, Section 37–2–1 to prove husband predeceased wife, and did not do so;

III. Corlett failed to present substantial evidence of the cause of husband's death; and

IV. Corlett failed to present substantial evidence that wife was negligent.

Smith also contended the trial court erred in:

V. Permitting testimony and argument to the jury on loss of household services; and

VI. Refusing to allow Smith to present evidence of property the statutory beneficiaries would receive under husband's will.

In his appeal on remand, Smith raises several issues that are related to the argument that the trial court lacked subject matter jurisdiction. We discuss those issues first and under that heading.

DISCUSSION.

I. DID THE TRIAL COURT ERR IN REFUSING TO DISMISS THE CASE FOR LACK OF SUBJECT MATTER JURISDICTION BECAUSE CORLETT FAILED TO COMPLY WITH NMSA 1978, SECTION 45–3–803, WHICH REQUIRES TIMELY FILING OF ALL CLAIMS MADE AGAINST THE ESTATE?

The filing provisions in Section 45–3–803(A) and (B) apply only to claims against the estate; claims that will be paid by insurance are not considered to be claims against the estate. *Sommermeyer v. Price,* 198 Colo. 548, 603 P.2d 135 (1979) (En Banc). "[T]he [insurance] proceeds are not available to the general creditors or beneficiaries of the estate. Moreover, the claims of the plaintiffs to be satisfied by the insurance proceeds do not affect the interests of the beneficiaries under the es-

tate and thus present no obstacle to an orderly and exact administration of the estate." *Id.*, 198 Colo. at 552, 603 P.2d at 138.

█ A failure to file within the statutory period bars only the right to enforce any liability of the estate beyond the limits of the insurance policy. The action itself is not barred. *Kent Ins. Co. v. Estate of Atwood,* 481 So.2d 1294 (Fla.App.1986). Although a liability insurance contract is an asset of the estate, it creates a contractual right which vests only when the liability claim against the insured ripens into judgment. *Tank v. Peterson,* 214 Neb. 34, 332 N.W.2d 669 (1983). Thus, Corlett was free to pursue his claim against the estate if he sought a judgment that he ultimately might collect from the insurance company. *Cf. Torrez v. State Farm Mut. Auto. Ins. Co.,* 705 F.2d 1192 (10th Cir.1982) (cause of action for wrongful failure to settle claim within policy limits did not accrue until wrongful death judgment against tortfeasor's estate was final).

Smith argues that the trial court was ordered on remand to determine the actual insurance coverage possessed by wife. He contends that the suit must therefore be dismissed, because the insurance company was an indispensable party to a determination of coverage but was not joined. *See* SCRA 1986, 1–019(B). Smith also contends that Corlett did not present enough proof to make a prima facie showing of insurance coverage at the hearing on remand; that the district court erred in construing the contracts of insurance; and that the district court invaded the province of this court by some of its findings.

█ In this case, both policies contained a provision that no suit would lie against the company unless the amount of the insured's obligation to pay had been finally determined by judgment against the insured after actual trial or by written agreement. Under these circumstances, we cannot conclude that the insurance company claims an interest in the subject of the action. *Cf.* R. 1–019(A)(2).

Section 45–3–803(C)(2) waives the timely filing requirement of subsections 803(A) and (B) for "any proceeding to establish liability of the *decedent* * * * for which he is *protected* by liability insurance." (Emphasis added.) The statute does not mention any determination of the nature or extent of any future liability of the insurance company. If the existence of protection for the purposes of Section 45–3–803(C) does not require a definitive statement of (1) whether the insurance company will eventually have to pay a claim, (2) the nature of the coverage, or (3) the extent of the actual coverage, then complete relief may be granted without the presence of the insurance company. *Cf.* R. 1–019(A)(1). Coverage may, however, be determined at this point, if the insurance company is a party. *See In re Estate of Daigle,* 634 P.2d 71 (Colo.1981) (En Banc).

█ We hold that, for the purposes of the Probate Code, "protection" should be considered the potential right to payment of a claim against the insurance company. A determination of whether potential coverage exists can be made in the absence of the insurance company. This interpretation will not impede the efficient and orderly administration of the estate of the insured because, on these facts, it is clear that the claim has been made in order to establish liability rather than to collect against the estate.

The policies themselves were entered into evidence; they show limits of $300,000 and contain provisions that arguably cover wife's liability. This supports a finding of potential coverage, which supports the trial court's conclusion that the insurance exception applied. We do not address defendant's argument that plaintiff failed to make a prima facie showing of coverage, because only a showing of protection was necessary. *See Uniform Probate Code* § 3–803(c), 8 U.L.A. 355 (1983) comment ("Tort claims normally will involve casualty insurance of the decedent * * * and so will fall within [this] exception.").

Smith also objects to certain of the trial court's findings as exceeding the scope of the mandate to the extent these findings determine coverage. We note that in re-

viewing all issues of indispensable parties raised for the first time on appeal, an appellate court may properly require suitable modification as a condition of affirmance. *Cf. Kroblin Refrigerated Xpress, Inc. v. Pitterich*, 805 F.2d 96 (3d Cir.1986) (an appellate court must consider the fact that a judgment binding on the parties has already been reached after extensive litigation). This furthers the interests of the courts and the public in complete, consistent, and efficient settlement of controversies.

■ Even if a finding of fact or conclusion is erroneous, if it is unnecessary to the court's decision, the mistake is not a basis for reversal. *Newcum v. Lawson*, 101 N.M. 448, 684 P.2d 534 (Ct.App.1984). Only findings by the trial court of ultimate fact are binding on review. *Porter v. Mesilla Valley Cotton Prod. Co.*, 42 N.M. 217, 76 P.2d 937 (1937). Those portions of the trial court's findings objected to by defendant are not essential to, and do not contradict, the conclusion that specific insurance protection existed. We affirm the trial court's decision that Corlett was entitled to rely on Section 45–3–803(C)(2) on the basis that he proved the potential existence of coverage. The issue of coverage has not been decided.

II. DID THE TRIAL COURT ERR IN REFUSING TO DISMISS THE CASE BECAUSE CORLETT WAS REQUIRED BY NMSA 1978, SECTION 37–2–1 TO PROVE HUSBAND PREDECEASED WIFE, BUT DID NOT DO SO?

■ Defendant contends that, although Section 37–2–1 provides both that causes of action for wrongful death and those for personal injuries survive the death of the tortfeasor, that statute requires proof that the injured party died before the tortfeasor. He interprets *Cash v. Addington*, 46 N.M. 451, 131 P.2d 265 (1942), as holding that a cause of action survives if it accrues before the death of the wrongdoer, and he notes that NMSA 1978, Section 41–2–2 (Repl.1986) provides that the cause of action for wrongful death accrues as of the date of death. This argument is not persuasive.

Neither the case nor the statutes require additional proof of the order of death. *See Maloney v. Victor*, 175 Misc. 528, 25 N.Y. S.2d 257 (1940); *contra Martinelli v. Burke*, 298 Mass. 390, 10 N.E.2d 113 (1937). We decline to add that requirement. *See generally* 1 S. Speiser, *Recovery for Wrongful Death* § 8:16 (2d ed. 1975) (a number of modern decisions, under statutes which are far from explicit, hold that the cause of action for wrongful death survives despite the fact that tortfeasor predeceases victim).

In *Cash v. Addington*, the supreme court did hold that a cause of action for personal injury survives if it does accrue, however short the time, before the death of the wrongdoer. It did not, however, hold that a cause of action for wrongful death can only accrue where the victim dies before the wrongdoer. At the time *Cash v. Addington* was decided, a cause of action for personal injury or wrongful death accrued at the time of the injury. The supreme court observed that the actionable act or neglect must have been accomplished by the tortfeasor while the tortfeasor was still alive.

The trial court in *Cash v. Addington* had determined that the tortfeasor died "instantaneously" in the car crash which injured the plaintiff. The supreme court was "of the opinion that the statute does not recognize a distinction where a wrongdoer lives a reasonable length of time and one where death resulting from an injury is commonly spoken of as having been instantaneous." 46 N.M. at 453, 131 P.2d at 266. The rationale underlying its opinion was:

"Under [a] statute providing that no cause of action for injury to person or property shall be lost because of [the] death of [the] person liable for the injury, the estate of a decedent may be charged with liability *even though the cause of action should not have arisen until after the death of decedent* provided the damage was due to decedent's otherwise actionable act or neglect."

*Id.* (emphasis added) (quoting *Maloney v. Victor,* 175 Misc. at 528, 25 N.Y.S.2d at 257, Headnote No. 3). In quoting *Maloney v. Victor,* the supreme court in effect equated Section 37–2–1 with a statute providing that no cause of action shall be lost because of the death of the wrongdoer. Under such a statute, the order of death is irrelevant.

We conclude that under Section 37–2–1, the order of death is not an element of plaintiff's case. If husband's death was occasioned by wife's otherwise actionable act or neglect, it occurred while she was still living. That is sufficient. *See Cash v. Addington.*

III. DID THE TRIAL COURT ERR IN REFUSING TO DISMISS THE CASE BECAUSE CORLETT FAILED TO PRESENT SUBSTANTIAL EVIDENCE OF THE CAUSE OF HUSBAND'S DEATH?

Smith contends that the certificate of death for husband was not admissible to prove the cause of his death, and that the medical expert who testified could not base his opinion on that certificate, because the statement that the cause of death was carbon monoxide poisoning was the opinion of another, non-testifying expert. Smith argues that the non-testifying expert's statement of cause of death is incompetent because he cannot be questioned as to the basis of that statement or how he arrived at it.

Because the statement in the death certificate that the cause of death was carbon monoxide poisoning is offered to prove the truth of the matter asserted, it is hearsay. SCRA 1986, 11–803(I) allows an exception to the required exclusion of hearsay for "[r]ecords or data compilations, in any form, of * * * deaths * * * if the report thereof was made to a public office pursuant to requirements of law." We believe that exception is applicable here.

Most jurisdictions hold that death certificates are admissible as evidence of cause of death. Courts will not, however, readily admit death certificates as evidence of the manner of death, e.g., "suicide" or "acci-dental," deeming that conclusion not a fact, but an opinion. *See Pollard v. Metropolitan Life Ins. Co.,* 598 F.2d 1284 (3d Cir. 1979); *Bowman v. Redding & Co.,* 449 F.2d 956 (D.C.Cir.1971); *Hestad v. Pennsylvania Life Ins. Co.,* 295 Minn. 306, 204 N.W.2d 433 (1973); *see generally* Annot., *Official Death Certificate as Evidence of Cause of Death in Civil or Criminal Action,* 21 A.L.R.3d 418 (1968).

The plaintiff in *Greek v. Bassett,* 112 Mich.App. 556, 316 N.W.2d 489 (1982), also argued, in part, that the statement in a death certificate of cause of death is not a fact but an inadmissible opinion. That court held the certificate admissible to show the cause of death under Federal Rule 803(9), which is identical to SCRA 1986, 11–803(I).

If we were to require that a statement in a death certificate be a "fact" in the sense of an absolute objective reality, virtually nothing in a death certificate would be admissible. For instance, the identity of the deceased, although usually not in dispute, is sometimes not easily ascertainable. In any case, the death certificate's statement of "identity" is merely the examiner's opinion of identity. The same would be true for the stated time of death.

*Id.,* 112 Mich.App. at 562, 316 N.W.2d at 492.

Smith argues that the statement of cause of death must be viewed as an opinion because the death certificate contains the paragraph: "On the basis of examination and/or investigation, in my opinion death occurred at the time, date and place and due to the cause(s) stated." We do not agree that this changes the essential nature of the statement of cause of death.

We hold that the statement of the cause of death is a factual finding, similar in nature to the factual findings of the identity of the deceased, the time and the date of death, and thus it is admissible under the vital statistics exception to the hearsay rule. Thus, we do not agree with Smith's argument that Dr. Parkes' testimony must be excluded because he relied on the opinion of a non-testifying witness con-

tained in that certificate. Because both the death certificate and Dr. Parkes' testimony were properly admitted, there was substantial evidence of causation.

### IV. DID THE TRIAL COURT ERR IN REFUSING TO DISMISS THE CASE BECAUSE CORLETT FAILED TO PRESENT SUBSTANTIAL EVIDENCE THAT WIFE WAS NEGLIGENT?

Smith contends that the fact the door between the garage and the kitchen was found open by the first person at the scene does not establish wife's negligence. Defendant cites SCRA 1986, UJI Civ. 13–1616, to the effect that the mere happening of the accident is not negligence. Defendant argues that Corlett was required to show that (1) wife either opened the door or left open an already open door, and (2) she knew or should have known of the dangerous propensities of carbon monoxide in that setting.

Corlett was not required to establish that there was no other cause for the open door. Rather, he was required to demonstrate that under these circumstances, wife had a duty to ensure the door was closed and it is more likely than not that wife either opened the door or failed to close it, thus breaching that duty. SCRA 1986, UJI Civ. 13–304, 13–1601, & 13–1604.

The question of what comprised wife's duty is not properly reviewed for substantial evidence. Whether a duty exists is not a fact question for the jury, but rather a question of law for the court to determine. *Baca v. Britt,* 73 N.M. 1, 385 P.2d 61 (1963). The facts support an inference that wife was in fact aware of the dangerous propensities of automobile exhaust. A reasonable person would have prevented movement of the exhaust by closing the open door. *Cf. Otero v. Burgess,* 84 N.M. 575, 505 P.2d 1251 (Ct.App.1973) (person in charge of dangerous instrumentalities must use degree of care commensurate with that instrumentality).

■ Although there is no proof that wife opened or left open the door, there is evidence the door was open on November 25, 1981, five days after the Bishops were last seen alive. From that proof, one could infer the truth of the fact sought to be proved, i.e., that wife opened the door or left it open. *Ulibarri Landscaping Material, Inc. v. Colony Materials, Inc.,* 97 N.M. 266, 639 P.2d 75 (Ct.App.1981) (inferences may be drawn from circumstantial evidence); *see also* SCRA 1986, UJI Civ. 13–308.

### V. DID THE TRIAL COURT ERR IN PERMITTING TESTIMONY AND ARGUMENT TO THE JURY ON LOSS OF HOUSEHOLD SERVICES?

Corlett's expert gave his opinion as to the present value of household services provided by husband. Decedent's son laid the foundation for this testimony when he testified that his father "did about 30 hours a week" of work around the house.

Smith contends that it was reversible error to allow the jury to consider the value of husband's household services because all members of the household to whom he rendered those services are now dead. We disagree.

The proper measure of damages in a wrongful death action under NMSA 1978, Sections 41–2–1, –3 (Repl.1986) is the value of the life had it continued. SCRA 1986, UJI Civ. 13–1830. Damages are recoverable for wrongful death if damages could have been recovered had there been no death. *Stang v. Hertz Corp.,* 81 N.M. 69, 463 P.2d 45 (Ct.App.1969) (*Stang I*). Damages are recoverable whether or not there are statutory beneficiaries, *Stang I; Stang v. Hertz Corp.,* 81 N.M. 348, 467 P.2d 14 (1970) (*Stang II*), and whether or not there are pecuniary injuries to those beneficiaries. *Id.*

■ The jury here was properly instructed that the basis for any damage award should be "[t]he monetary worth of the life of the deceased" as modified by any aggravating or mitigating circumstances attending the act from which the original liability arose. *See* UJI Civ. 13–1830. The jury was further properly instructed to consider both earning capacity and habits, among

other things, in determining the monetary worth of the life of the deceased. Finally, it was told that in considering earning capacity or loss of earnings, deductions must be made for "personal living expenses of the deceased."

When husband performed household services, other income-producing activity could not be undertaken. Further, specific costs would be incurred if someone else were retained to perform them. We believe the value of those services is an evidentiary item admissible in this case in establishing the present worth of husband's life. *Cf. Lujan v. Gonzales*, 84 N.M. 229, 501 P.2d 673 (Ct.App.1972) (the factfinder may consider evidence of household services to the statutory beneficiaries in awarding damages for the pecuniary value of a life).

## VI. DID THE TRIAL COURT ERR IN REFUSING TO ALLOW SMITH TO PRESENT EVIDENCE OF PROPERTY THE BENEFICIARIES IN THE WRONGFUL DEATH ACTION WOULD BE RECEIVING UNDER HUSBAND'S WILL?

Smith contends that evidence of the amounts received by the beneficiaries under the will should have been admitted, because pecuniary gain should be a component of pecuniary loss to statutory beneficiaries considered by the jury when it determines damages in a wrongful death suit. This argument is premised on the view that husband's death produced an economic benefit. There are several answers to this argument.

First, since the proper measure of damages is the value of continued life, evidence of benefits received because life ended is irrelevant. Had husband lived, the beneficiaries would have received the benefits of his continued life, as well as retained their entitlement to any benefits provided under his will.

Second, although the loss to beneficiaries of expected benefits that have a monetary value may be considered when determining damages, damages may be awarded even where monetary loss to the surviving beneficiaries cannot be shown. UJI Civ. 13–1830. *Stang I; Stang II.* Demonstrating pecuniary injury, whether or not it includes gain, is not a prerequisite to recovery for wrongful death. *Stang II.* In this case, the jury was not instructed concerning monetary loss to the statutory beneficiaries.

Finally, considering the property or wealth of the beneficiaries or of the defendant is specifically proscribed. UJI Civ. 13–1830. It is not a legitimate factor for the jury's consideration. *Id.* Benefits received under a will surely add to the property or wealth of a beneficiary. Evidence of such benefits is not admissible.

## CONCLUSION.

The trial court did not err in denying Smith's motion to dismiss. While Corlett's right to enforce any liability of the estate beyond the policy limits is barred, the cause of action is not. Further, there was sufficient evidence to support submission of the issues of causation and negligence to the jury. Finally, Smith has not established any error in the trial court's evidentiary rulings. We affirm the judgment in favor of Corlett. Smith shall bear the costs of his appeal.

IT IS SO ORDERED.

BIVINS and APODACA, JJ., concur.

764 P.2d 142

**Margery W. FOUGHT, Personal Representative of Harlen D. Fought, Deceased, Plaintiff–Appellant,**

v.

**STATE of New Mexico, Defendant–Appellee.**

No. 10061.

Court of Appeals of New Mexico.

Oct. 11, 1988.

Anthony F. Avallone, Glenn B. Neumeyer, Law Systems of Las Cruces, P.A., Las Cruces, for plaintiff-appellant.

J. Duke Thornton, Butt, Thornton & Baehr, P.C., Albuquerque, for defendant-appellee.

OPINION

DONNELLY, Chief Judge.

Plaintiff appeals the trial court's denial of her motion for postjudgment interest on a prior judgment obtained against the New Mexico State Highway Department (State) for the wrongful death of her husband. We discuss whether the trial court properly denied postjudgment interest against the State and affirm.

Plaintiff argues that the trial court erred in denying postjudgment interest on a judgment obtained against a governmental entity under the Tort Claims Act, NMSA 1978, Sections 41–4–1 to –27 (Repl.Pamp.1986). Specifically, plaintiff contends that, because Section 41–4–19 of the Act prohibits punitive damages and prejudgment interest and is silent as to postjudgment interest, the Act permits an award of postjudgment interest.

Section 41–4–19(B) provides: "No judgment against a governmental entity or public employee for any tort for which immunity has been waived under the Tort Claims Act shall include an award for exemplary or punitive damages *or for interest prior to judgment.*" (Emphasis added.)

■ The fact that the act is silent as to postjudgment interest does not indicate that the legislature intended to permit recovery of postjudgment interest against the State. In construing statutes, this court will not read into a statute language which does not exist, particularly if the statute makes sense as written. *See Perez v. Health & Soc. Servs.*, 91 N.M. 334, 573 P.2d 689 (Ct.App.1977). Moreover, the Tort Claims Act must be strictly construed. *Methola v. County of Eddy*, 95 N.M. 329, 622 P.2d 234 (1980). At the time the Tort Claims Act was enacted, statutory provisions for post-judgment interest referred to judgments based on contracts. *See* NMSA 1953, §§ 50–6–3 & –4. The legislature is presumed to have been aware of existing statutory and common law. *See Bettini v. City of Las Cruces*, 82 N.M. 633, 485 P.2d 967 (1971).

Plaintiff also argues that NMSA 1978, Section 56–8–4(D) (Repl.Pamp.1986) exempts the State and its political subdivisions from awards of postjudgment interest, except as provided by statute or common law. Section 56–8–4 provides, in part:

A. Interest shall be allowed on judgments and decrees for the payment of money from entry and shall be calculated at the rate of fifteen percent per year. . . .

. . . .

D. *The state and its political subdivisions are exempt from the provisions of this section except as otherwise provided by statute or common law.* [Emphasis added.]

Plaintiff contends that because the common law permitted postjudgment interest to accrue against the State, the State is not exempt under this provision. Plaintiff has pointed to no authority for the proposition that the common law permitted postjudgment interest to accrue against the State. In fact, at common law, judgments against any party did not bear interest. *See Pierce v. United States*, 255 U.S. 398, 41 S.Ct. 365, 65 L.Ed. 697 (1921); *Washington & Georgetown R.R. Co. v. Harmon's Adm'r*, 147 U.S. 571, 13 S.Ct. 557, 37 L.Ed. 284 (1893).

Moreover, interest, as a general rule, cannot be recovered in a suit against a state or the federal government. *See Library of Congress v. Shaw*, 478 U.S. 310, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986); *Hyde v. Wellpinit School Dist. No. 49*, 32 Wash. App. 465, 648 P.2d 892 (1982). However, interest may be awarded when the legislature or Congress has, either expressly or by reasonable construction of a statute, consented to such award. *See* Annotation, *Recovery of Interest on Claim Against a Governmental Unit in Absence of Provision in Contract or Express Statutory Provision*, 24 A.L.R.2d 928 (1952); *see also Bradbury & Stamm Constr. Co. v. Bureau of Revenue*, 70 N.M. 226, 372 P.2d 808 (1962).

■ Because any statute allowing interest against the state is in derogation of common law, it must be strictly construed. *See State ex rel. Miera v. Chavez*, 70 N.M. 289, 373 P.2d 533, 373 P.2d 533 (1962). There can be no liability for interest of any kind without specific statutory language subjecting the state to liability. *See generally City of Springfield v. Allphin*, 82 Ill.2d 571, 45 Ill.Dec. 916, 413 N.E.2d 394 (1980); *Brown v. State Highway Comm'n*, 206 Kan. 49, 476 P.2d 233 (1970); *Myers v. Department of Crime Control & Pub.*

*Safety*, 67 N.C.App. 553, 313 S.E.2d 276 (1984).

We interpret both the Tort Claims Act and Section 56–8–4(D) to deny an award of postjudgment interest on final judgments entered against the State. The decision of the trial court is affirmed.

IT IS SO ORDERED.

ALARID and APODACA, JJ., concur.

764 P.2d 143

**Tim JIMERSON, Plaintiff–Appellant,**

v.

**ARAPAHOE DRILLING, Employer and the Home Insurance Company, Insurer, Defendants,**

**and**

**Fabian Chavez, Superintendent of Insurance, and the New Mexico Subsequent Injury Fund, Defendants and Third–Party Defendants–Appellees.**

**No. 10481.**

Court of Appeals of New Mexico.

Oct. 25, 1988.

Bruce P. Moore, Albuquerque, Victor A. Titus, Farmington, for plaintiff-appellant.

Ellen S. Casey, Hinkle, Cox, Eaton, Coffield & Hensley, Santa Fe, for defendants and third-party defendants-appellees.

## OPINION

DONNELLY, Chief Judge.

This appeal poses the issue of whether a worker who has failed to satisfy the statutory provision requiring that timely notice of a work-related accident and injury be given to his employer under the Workers' Compensation Act may, nevertheless, maintain a separate action arising out of the same injury against the Subsequent Injury Fund (Fund). NMSA 1978, § 52–1–29 (Orig.Pamp.). We hold that plaintiff's failure to comply with the statute requiring notice to his employer also bars any claim against the Fund.

In 1981 plaintiff suffered a work-related injury while employed in Florida. As a result of his initial injury, plaintiff sustained a 10% disability. Thereafter plaintiff moved to New Mexico and secured employment with Arapahoe Drilling Company (Arapahoe). In December 1985 he suffered another injury and filed suit against Arapahoe, seeking recovery of worker's compensation benefits. Both plaintiff and Arapahoe moved to interplead the Fund as a defendant in the case.

Following trial, the trial court dismissed plaintiff's action against both Arapahoe and the Fund, finding that plaintiff had failed to give any written notice of accident to Arapahoe and that Arapahoe did not have timely actual knowledge of the accident. On appeal plaintiff does not contest the trial court's finding of lack of required notice or dismissal of his claim against Arapahoe. Instead, plaintiff maintains that although his action against Arapahoe was barred by a lack of notice as required by Section 52–1–29, he nevertheless is entitled to pursue a claim against the Fund under the Subsequent Injury Act (SIA). NMSA 1978, §§ 52–2–1 to –13 (Orig.Pamp. & Cum.Supp.1986).

We first address a threshold issue raised by the Fund concerning whether this court need reach the issue of notice since the trial court's decision contains no findings and conclusions that would subject the Fund to liability even if this court were to hold in plaintiff's favor on the notice question. The Fund argues that the trial court's refusal of Arapahoe's findings of fact amounted to a finding against plaintiff and Arapahoe as to the Fund's liability because (1) Arapahoe requested findings of fact and conclusions of law seeking a determination that the Fund was liable for a portion of the disability suffered by plaintiff, (2) the trial court did not adopt these requested findings and conclusions, and (3) Arapahoe had the burden of proof on this issue. *See H.T. Coker Constr. Co. v. Whitfield Transp., Inc.*, 85 N.M. 802, 518 P.2d 782 (Ct.App.1974) (where party has burden of proof on issue and requests findings on that issue which are refused, legal effect of refusal is finding against the party). Additionally, the Fund argues that plaintiff's claim is not subject to appellate review because plaintiff did not request the necessary prerequisite findings to establish the Fund's liability.

It is clear the trial court did not decide the case on the basis of lack of merit of

plaintiff's substantive claim; it did not reach that issue. Instead, the findings and conclusions adopted by the trial court establish that its order of dismissal was based solely on the fact that no timely notice was given to Arapahoe and that the employer did not have actual notice of the occurrence giving rise to plaintiff's claimed disability. Under these circumstances, we do not construe the trial court's failure to adopt the relevant findings as constituting findings against the worker or his employer on the underlying claim of disability. *See Clark v. LeBlanc*, 92 N.M. 672, 593 P.2d 1075 (1979) (where trial court did not reach the question relating to the requested findings of plaintiff, but decided case on other grounds, court's failure to adopt findings were not considered findings against plaintiff). Therefore, we properly reach the merits of the issue raised by plaintiff herein.

Plaintiff contends that because the notice requirement was not expressly incorporated in the SIA, he is not barred from seeking independent recovery for a portion of his claimed disability against the Fund. The SIA, however, specifically provides that determinations concerning a worker's rights under the statute shall be made in the same manner as cases arising under the Workers' Compensation Act, NMSA 1978, Section 52-1-1 to -69 (Orig.Pamp.). *See* § 52-2-13. This statutory provision has been interpreted to mean that the procedures involved in claiming benefits under the SIA are the same as those provisions applicable to claims for worker's compensation benefits. *See Duran v. Xerox Corp.*, 105 N.M. 277, 731 P.2d 973 (Ct.App.1986). However, not all provisions of the Workers' Compensation Act have been incorporated into the SIA. *Id.* Decisions concerning those provisions which are necessarily incorporated into the SIA, and those which are not, must be made in light of legislative intent and examination of the purposes of the SIA. *Id.* This court determined in *Duran* that all of the procedural provisions of the Workers' Compensation Act were incorporated into the SIA except those that hinder or do not further the goals and purposes of that act. *See also Hernandez*

*v. Levi Strauss, Inc.*, 107 N.M. 644, 763 P.2d 78 (Ct.App.1988).

A worker is eligible for compensation under the SIA where it is established that (1) the worker had a preexisting permanent impairment, (2) the worker sustained a subsequent disability *compensable under the Workers' Compensation Act,* and (3) the subsequent disability is permanent and is materially and substantially greater than that which would have resulted from the subsequent injury alone. *Vaughn v. United Nuclear Corp.*, 98 N.M. 481, 650 P.2d 3 (Ct.App.1982); *Ballard v. Southwest Potash Corp.*, 80 N.M. 10, 450 P.2d 448 (Ct.App.1969).

The purpose of the notice provision in the Workers' Compensation Act is to allow an employer to investigate an accident while the facts are accessible and, if necessary, to employ doctors to speed recovery. *Beckwith v. Cactus Drilling Corp.*, 84 N.M. 565, 505 P.2d 1241 (Ct.App.1972); *see also Herndon v. Albuquerque Pub. Schools*, 92 N.M. 635, 593 P.2d 470 (Ct.App. 1978) (statute designed to protect employer so that he may inquire into the facts and circumstances and to prevent the filing of fictitious claims where passage of time would make a determination of the true facts difficult). The notice provision contained in Section 52-1-29 is a mandatory prerequisite to recovery under the Workers' Compensation Act. *Herndon v. Albuquerque Pub. Schools.* Plaintiff's contention, if upheld, would change the focus of the SIA and leave the Fund without access, through discovery, to the results of any investigation the employer might have performed had proper notice been given. Moreover, litigation against the Fund would be encouraged despite the fact that the same litigation against plaintiff's employer is barred. We find such result inconsistent with the purposes of the SIA. Although the SIA is to be construed liberally, statutory construction must give effect to the stated purposes of the act and announced legislative intent. *Padilla v. Chavez*, 105 N.M. 349, 732 P.2d 876 (Ct.App. 1987).

In enacting the SIA, the legislature sought to encourage the hiring of handicapped workers by limiting an employer's liability for second injuries covered by the Workers' Compensation Act. *Hernandez v. Levi Strauss, Inc.; Gutierrez v. City of Gallup,* 102 N.M. 647, 699 P.2d 120 (Ct. App.1984). The SIA protects employers from full liability for a disability when the covered injury causes a materially and greater disability to a previously handicapped worker than would have resulted from the subsequent injury. *Id.; Romero v. Cotton Butane Co.,* 105 N.M. 73, 728 P.2d 483 (Ct.App.1986). Because the clear purpose of the SIA is to encourage the employment of handicapped workers and to avoid placing the full liability on an employer for any subsequent disability sustained by an employee, we conclude that the legislature intended the provisions of the SIA would apply only in those instances where an employer is also subject to liability under the Workers' Compensation Act. In order for the Fund to be liable under the SIA, the second injury must be compensable. *Vaughn v. United Nuclear Corp.; Ballard v. Southwest Potash Corp.*

Plaintiff argues that the holding in *Duran* compels a favorable ruling on his claim. The decision in *Duran,* however, is inapposite to the instant case. In *Duran* the Fund sought to interpose the statute of limitations as a procedural bar to the worker's claim under the SIA, even though the worker had satisfied all other prerequisites for recovery from his employer. Here, however, since plaintiff's failure to give the requisite notice relieved the employer of liability, the Fund is similarly not subject to liability for claims arising out of the same occurrence.

In sum, we hold that when a worker is barred for lack of notice from bringing an action against the worker's employer, an action against the Fund is also barred. The trial court's judgment is affirmed.

IT IS SO ORDERED.

BIVINS and ALARID, JJ., concur.

764 P.2d 492

Harry MENDOZA, Plaintiff–Appellee,

v.

The GALLUP INDEPENDENT CO., John K. Zollinger, Robert C. Zollinger, Donald W. Green a/k/a "Veritas", and Reed Eckhardt, Defendants–Appellants.

No. 10501.

Court of Appeals of New Mexico.

Aug. 16, 1988.

Lowell E. McKim, McKim, Head & Ionta, P.C., Gallup, for plaintiff-appellee.

Joseph L. Rich, Schuelke & Rich, Gallup, George R. McFall, Joseph E. Roehl, R.E. Thompson, Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, for defendants-appellants.

## OPINION

GARCIA, Judge.

Defendants appeal the trial court's denial of their motion for summary judgment in a defamation action. We granted defendants' application for interlocutory appeal, which raised the following two issues: (1) whether the statement at issue constitutes opinion, as a matter of law and, accordingly, whether the trial court erred in denying defendants' summary judgment motion; and (2) whether defendants made a prima facie showing that the statement, regardless of its nature, was made absent actual malice. We deem issue one to be dispositive and, accordingly, will not address the remaining issue. We reverse.

This action arose out of the publication of a column entitled "The Week's Wash" appearing in the opinion-editorial section of "The Gallup Independent" on April 18, 1987. *See* attached Appendix A. Plaintiff, Harry Mendoza (Mendoza), a Gallup city councilman, sued defendants for libel. The column describes a Gallup "tourism promotion" office outside of City Hall. Several tourists approach the "tourism counsel-or" for information. The counselor's office is made of packing crates, much like the famed character Lucy's psychiatrist office in Charles Shultz' "Peanuts" cartoon. The defamatory statements arise from the following exchange between the "tourism counselor" and "two tall, swarthy suit-and-tie types":

"I'm agent Frammis and this is agent Stanfran," one said, flashing open a dark wallet with gold leaf and fine black printing inside. "We're here to investigate your City Council."

"R-r-right in there," WW [Week's Wash] stammered. "But it's not in session just now. C-can I direct you to any particular member?"

"We have received a report," said the other one, "that the council has been taken over by the Mexican Mafia. What can you tell us about that?"

This was scarey. Word sure travels fast.

"Well, um, er, the new council hasn't met yet. But the new mayor is known for shooting first and asking questions later."

They patted the bulges under their coats.

"B-but he doesn't take office until May 5," WW hurried on. "He's already taken one straw vote on replacing the city manager, however."

"That may be it," said agent Stanfran. "Did anything happen that might support our tip?"

"Well, it's only one instance, and it's pretty controversial," WW equivocated, "and I can't say if it's the start of a trend. But you can decide for yourself.["]

"The vote was Munoz, Mendoza, and Gutierrez on one side and Richards and Hight on the other."

Mendoza alleges that the above statements imputed his involvement in corruption, dishonesty and criminal activity. The thrust of Mendoza's complaint is that the writing falsely links him to the Mexican Mafia. He does not contend, however, that the writing accuses him of any specific

criminal act or wrongdoing. Defendants moved for summary judgment on two grounds: (1) that the column was opinion and absolutely privileged as a matter of constitutional law; and (2) that defendants did not knowingly or recklessly publish a false statement of fact and, thus, did not act with actual malice as required by *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Mendoza responded with affidavits of various persons who interpreted the column as conveying factual allegations concerning him, together with his own affidavit on the issue of actual malice. The trial court, carefully and correctly noting factual disputes in the affidavits, denied defendants' summary judgment motion and certified its order for interlocutory appeal.

Whether the published statement constitutes opinion or fact.

■■■ We initially note that if the statements are purportedly "facts" as opposed to "opinions", then the trial court properly denied summary judgment because there are factual disputes on material issues which are properly resolved by a fact finder. The same is not true, however, if the statements constitute opinion. An action for defamation lies only for false statements of fact and not for statements of opinion. *Saenz v. Morris,* 106 N.M. 530, 746 P.2d 159 (Ct.App.1987). We recognize that:

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact.

*Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339-40, 94 S.Ct. 2997, 3006-07, 41 L.Ed.2d 789 (1974) (footnote omitted).

When the alleged defamatory statements could be fact *or* opinion, it is proper to deny summary judgment, as the trial court did here, and allow the fact finder to resolve the dispute. *See Marchiondo v. New Mexico State Tribune Co.,* 98 N.M. 282, 648 P.2d 321 (Ct.App.1981). However, if the statements are unambiguously opinion, the trial court may properly rule as a matter of law. *Marchiondo v. Brown,* 98 N.M. 394, 649 P.2d 462 (1982). Thus, we must initially determine whether the alleged defamatory material contains a protected statement of opinion.

In commenting on the differences between statements of fact and opinion, the California supreme court noted:

> The distinction frequently is a difficult one, and what constitutes a statement of fact in one context may be treated as a statement of opinion in another, in light of the nature and content of the communication taken as a whole. Thus, where potentially defamatory statements are published in a public debate, a heated labor dispute, or in another setting in which the audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole, language which generally might be considered as statements of fact may well assume the character of statements of opinion.

*Gregory v. McDonnell Douglas Corp.,* 131 Cal.Rptr. 641, 644, 552 P.2d 425, 428 (1976).

■■ In resolving the distinction between fact and opinion, the trial court should consider: (1) the entirety of the publication; (2) the extent that the truth or falsity of the statement may be determined without resort to speculation; and (3) whether reasonably prudent persons reading the publication would consider the statement to be an expression of opinion or a statement of fact. *Marchiondo v. Brown; see* SCRA 1986, 13–1004. In applying the above test to the statements, we believe the column expresses statements of opinion rather than fact.

■■ In considering the "entirety" requirement, the published statement must be read in context. First, the column here was situated on the "Opinion" page of the newspaper along with four other articles and an editorial cartoon. Readers of the opinion-editorial page generally expect to read the columnist's views and opinions as opposed to factual news stories. *Aldoupo-*

*lis v. Globe Newspaper Co.*, 398 Mass. 731, 500 N.E.2d 794 (1986) (En banc); *see Ollman v. Evans*, 750 F.2d 970 (D.C.Cir.1984), *cert. denied*, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985); *Loeb v. Globe Newspaper Co.*, 489 F.Supp. 481 (D.Mass.1980); *National Rifle Ass'n v. Dayton Newspapers, Inc.*, 555 F.Supp. 1299 (S.D.Ohio 1983).

■ Second, the column indicates, by the tag line "DAYS OF OUR LIVES", that it is fictitious in nature and not intended to represent factual statements. In addition, the column is entitled "The Week's Wash" and depicts a drawing of a clothes line laden with clothing. The column's setting is unreal. The tourism office is set up "on the front walk of City Hall in a booth made out of a couple of apple crates, Lucy-style." The homemade sign reads: " 'Free Tourism Information—The tourism counselor is IN.' " Equally fictitious are the visitors to the booth: one visitor has heard that " 'Red Rock Park has cracks in it the size of the Grand Canyon * * * * ' "; another has heard that Gallup has the " 'world's biggest zero.' " [1] The tongue-in-cheek style used by the author alerts all but the most careless readers that the descriptions were no more than rhetorical hyperbole. *See Pring v. Penthouse Int'l, Ltd.*, 695 F.2d 438 (10th Cir.1982), *cert. denied*, 462 U.S. 1132, 103 S.Ct. 3112, 77 L.Ed.2d 1367 (1983); *Catalfo v. Jensen*, 657 F.Supp. 463 (D.N.H.1987); *Ollman v. Evans*.

■ Moreover, under the second-prong of the *Marchiondo* test, the column constitutes "pure opinion". *See* 3 Restatement (Second) of Torts § 566 (1977); *Saenz v. Morris*. Under the Restatement, "[a] defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." Restatement, *supra*, § 566 at 170. However, if the material, as a whole, fully discloses the facts upon which the opinion

is based and permits the reader to reach his own opinion, the statement is generally an opinion rather than an assertion of fact, and is absolutely protected. *Saenz v. Morris; Kutz v. Independent Publishing Co.*, 97 N.M. 243, 638 P.2d 1088 (Ct.App.1981).

In the case at bar, "WW" is asked whether the Mexican Mafia has taken over the council. "WW" reaches no conclusion, but reports the vote results on the straw poll, together with the surnames of the councillors who cast the votes. The writer invites readers to reach their own conclusions by stating to "agents" Stanfran and Frammis, " '[I]t's only one instance * * * and I can't say if it's the start of a trend. But you can decide for yourself.' "

Plaintiff argues that the writer's observation that: "This was scarey. Word sure travels fast." implies that the author had private knowledge that the council had been taken over by the "Mexican Mafia." We disagree. When placed in context and read as a whole, we believe the column discloses the factual basis for the writer's opinion, namely, the straw vote to replace the city manager, and the ethnicity of the councillors who cast the votes. The opinion leaves no room for speculation or implication that the writer has private knowledge of defamatory facts. *See Marchiondo v. Brown*.

■ For the third-prong of the *Marchiondo* test, plaintiff submitted affidavits of various members of the Gallup and Raton community to show that six reasonably prudent persons interpreted the column's statements as a representation of fact. Each affiant expressed their belief that the term "Mexican Mafia" referred to a vast criminal organization whose leaders are of Mexican descent. Each also interpreted the column as a statement that Mendoza was either a member of, or under the control of, the "Mexican Mafia." These affidavits, though well-intended, are irrelevant. Whether the statements are capable of a defamatory meaning is initially a question

---

**1.** During the municipal elections in Gallup, New Mexico, which *preceded publication of the* article, Munoz, candidate for office, referred to councilman George Hight as a "Big Zero." The candidate's remark, together with his subsequent apology, were previously published in The Gallup Independent.

of law for the trial court, not a question of fact. *See Marchiondo v. New Mexico State Tribune Co.*

In addition to failing the *Marchiondo* three-prong test, plaintiff's reliance on *Cianci v. New Times Publishing Co.*, 639 F.2d 54 (2nd Cir.1980), is misplaced. In *Cianci*, plaintiff was accused, in a published magazine article, of specific criminal acts, including rape, and of paying off the victim to avoid prosecution. The *Cianci* court held that the charges were not employed in a " 'loose, figurative sense' " or as " 'rhetorical hyperbole,' " as here, rather, the court determined that the statement imputed specific criminal activity. *Id.* 639 F.2d at 64. Such is not the situation here. No specific accusation was made against Mendoza; no specific criminal act was charged. Further, the underlying facts giving rise to the publisher's opinion are apparently undisputed: a straw vote was taken; the vote was three-to-two; three councillors with Hispanic surnames voted one way, while the two remaining councillors voted another. This was not the case in *Cianci*, where the underlying facts were vigorously challenged.

Nor is plaintiff's reliance on *Hustler Magazine v. Falwell*, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) well founded. In *Hustler Magazine*, plaintiff Falwell sued defendant Hustler Magazine for invasion of privacy, libel, and intentional infliction of emotional distress. *Id.* The suit arose out of Hustler's publication of an advertisement parody concerning Falwell. *Id.* The trial court directed a verdict for defendant on the privacy claim and the jury found for defendant on the libel claim. *Id.* The jury, however, awarded damages to plaintiff on his claim for intentional infliction of emotional distress. *Id.* On appeal, the Supreme Court reversed Falwell's money judgment, holding that public figures and public officials may not recover for the tort of intentional infliction of emotional distress by reason of publication absent a showing that the publication contained a false statement of fact which was made with actual malice. *Id.*

Plaintiff notes that "as outrageous as the statements were in the offending article," the trial court in *Hustler Magazine*, nonetheless, allowed the libel claim to go to the jury. Nevertheless, we note that the jury found that the ad parody could not reasonably be understood as describing actual facts about plaintiff. *Id.* The question of whether plaintiff's libel claim in *Hustler Magazine* should have been allowed to go to the jury was not before the Supreme Court. The true import of *Hustler Magazine* is not the trial court's denial of defendant's summary judgment motion, but its extension of the First Amendment protections, previously announced in *Sullivan*, to cases of intentional infliction of emotional distress.

 We conclude that the alleged defamatory statement is an editorial opinion on a matter of local political interest. One of the most fundamental privileges protected under the First Amendment is the right to free, uninhibited, political debate. The Week's Wash column is a criticism of city officials and the incoming administration. Public officials, such as plaintiff, are often the target of "vehement, caustic and unpleasantly sharp attacks." *New York Times Co. v. Sullivan*, 376 U.S. at 270, 84 S.Ct. at 720; *see Hustler Magazine v. Falwell.* While we empathize with those stung with the barbs of racial slurs or ephitets, we must also recognize the vital role played by free, open and public discourse. First Amendment protections encourage and foster the dissemination of ideas and opinions. A publication is not deemed libelous simply because the opinion is expressed in terms of strong invectives, profanity or sarcastic language. *Marchiondo v. New Mexico State Tribune Co.* Further, fiery political dialogue, rhetoric, and public debate, including the use of epithets and hyperbole, are protected under the First Amendment of the Federal Constitution. *Id.*

In *Communications Workers of Am., Local 8611 v. Archibeque*, 105 N.M. 635, 735 P.2d 1141 (1987) the supreme court held that use of characterizations such as "amoral," "totally void of character," and

"an embarrassment," in the context of a labor dispute, were rhetorical hyperbole and not misstatements of fact. *See also Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers, AFL–CIO v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974) (in context of labor dispute, use of term "scab," accompanied by highly derogatory definition, held to be "rhetorical hyperbole," protected by First Amendment); *Greenbelt Coop. Publishing Ass'n v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970) (in context of dispute over zoning variances, use of term "blackmail" to describe plaintiff's negotiation position was "rhetorical hyperbole" and could not reasonably be understood to impute crime of blackmail); *Kutz v. Independent Publishing Co.* (average reader would have no difficulty in reading "rabid environmentalist" to be expression of writer's opinion).

██ Likewise, we are not convinced that the statements here could reasonably be interpreted as imputing criminal conduct to plaintiff. We believe that the column's use of the term "Mexican Mafia" in the context of the debate over issues of public interest is rhetorical hyperbole. *See Communications Workers of Am., Local 8611 v. Archibeque.* Accordingly, we deem, as a matter of law, the statements to have been "opinion" and not "fact." Hence, we reverse the trial court and remand with instructions that defendants' summary judgment motion be granted and Mendoza's complaint be dismissed with prejudice. By virtue of our determination that the statements are protected as a matter of law, we need not discuss defendants' second issue.

We remand with instructions to dismiss Mendoza's complaint with prejudice.

IT IS SO ORDERED.

BIVINS and APODACA, JJ., concur.

APPENDIX A

# Opinion

The Independent
Gallup, N.M.
Saturday, April 18, 1987

**8**

# Debate on missiles just beginning

## *White House, NATO pick up where George Shultz left off*

By David K. Shipler
The New York Times

BRUSSELS, Belgium — Now that Secretary of State George P. Shultz has finished three days of bargaining with the Russians on removing nuclear missiles from Europe, the other negotiations are beginning — those within the Reagan administration and within the North Atlantic Treaty Organization.

And they may be nearly as difficult. Shultz set the stage for the internal struggle with a virtual endorsement on Thursday of Moscow's new proposal to ban all Soviet and American short-range as well as medium-range nuclear missiles from Europe.

After meeting with NATO foreign ministers, Shultz told a news conference that his talks in Moscow had "created a great opportunity for the alliance."

He added that "we have the basic elements in place for a good agreement" by which "we can bring this whole pattern of Soviet deployment we've objected to back under control, and, from our point of view, that's good."

But the idea of a short-range ban, while attractive, has caused discomfort among Pentagon hard-liners and some West Europeans, who worry that it might be a step toward the "denuclearization" of Europe and a resulting West European vulnerability to superior Soviet conventional forces.

The counterargument holds that Europe still is protected by an umbrella of American strategic weapons, including

submarine-launched ballistic missiles, bombers and intercontinental ballistic missiles

But that, in turn, raises fears that the policy of "flexible response" will be undermined by the decision on short range and medium range missiles. Flexible response is the ability to meet a certain level of Soviet attack in Europe at the same level without having to resort to strategic weapons and full-scale nuclear war.

"It's a very important element of the picture," Shultz declared. "It means you don't limit yourself to a tight-switch approach."

Flexible response, he insisted, "will be maintained, whether we accept the Soviet short-range offer or not."

Other American officials pointed out that the Soviet American agreement would not ban the European own short range missiles, which are defined as those capable of flying 300 to 600 miles

Nor would it affect American bombers of various ranges or cruise missiles, which could be launched from ships off the European coasts to provide a flexible response.

Some Europeans worry that the needs of American disengagement from the European theater would be sown in this accord. But American officials want to know whether Europeans would permit the deployment of short range missiles on their territory.

The United States does not have any at all now, although it controls the nuclear

warheads for about 70 Pershing 1A missiles belonging to West Germany. American negotiators say these would not be banned by a Soviet American treaty

The Soviet offer would seem to make it very difficult politically for European governments to permit such deployment, in which case American officials see no point in pressing the Russians for the right to build up the American short range arsenal to the Soviet level, now estimated at 130 missiles.

That has been the American goal since the two sides agreed to ban medium-range missiles from Europe. Concerned that the Russians might circumvent that ban by shifting to shorter-range weapons, the Americans called for a ceiling for both sides equivalent to the current Soviet level.

One idea, reportedly advocated by the Pentagon, was to convert Pershing 2s from medium-range to short-range by removing one rocket stage, the result would be called the Pershing 1B.

Accepting the Soviet offer to eliminate short range missiles would mean abandoning this conversion, of course, and how the debate on this will play out in the administration is a question.

Shultz is a team player, and he is unlikely to have sounded so approving on Thursday without encouragement from President Reagan. Shultz spoke to the president from Moscow on a scrambled telephone in a special communications van that was flown in to avoid embassy bugs

But there is hardly a consensus in the

administration on a short range ban, aides And Shultz's record in forging policy out of contention is less than sterling.

He did not do very well in the internal debates that preceded his trip, losing to harder liners in the Pentagon in formulating major positions on intercontinental ballistic missiles and space-based defenses. One official described those arguments between Shultz and Defense Secretary Caspar W. Weinberger as "the most acrimonious" ever

The administration's internal disputes are less intense on the European issue than in the strategic area, however, and if questions can be resolved on verifying compliance and on linking the short range withdrawal with the medium range ban, the Soviet offer may prove irresistible to Reagan.

American negotiators are not sure about Soviet willingness to make the short-range ban part of the medium range treaty.

In Prague last week, Mikhail S Gorbachev proposed "to start talks on the reduction and later elimination" of short range missiles, "and not to link this with the course or the result of the solution of the medium-range missiles issue."

During the Moscow talks this week, however, the Soviet leader "expressed the readiness to record in an agreement on medium range missiles the Soviet Union's obligation to eliminate its shorter-range missiles," according to Tass, the official Soviet news agency

# New-breed spouses

## *Candidates' wives believe in exercising influence*

By David S Broder
The Washington Post

WASHINGTON — Tipper Gore's first book, "Raising PG Kids in an X-Rated Society," is described as a "call to arms" against "the shockingly explicit and brutally violent media messages found in today's rock music, videos, movies and advertisements."

It was published this month just as her 38-year-old husband, Sen. Albert Gore Jr , D-Tenn , was announcing a presidential bid based on expertise in arms control, competitiveness policies, environmental and medical ethics questions

Victor Ashe, the Republican who lost to the Gores in the 1984 Senate race, says the timing was "very definitely" no coincidence

"They are a couple who know where they're going They work as a team She takes care of the right and he takes care of the middle and the left," he said

One need not accept Ashe's conclusion to recognize that Tipper Gore is one of the new-breed spouses who are likely to redefine the concept of the candidate's wife in 1988 and of First Lady in 1989.

"If the world is having trouble with a Nancy Reagan" exercising influence in the White House, says Ruth Mandel, director of the Center for the American Woman and Politics at Rutgers Universit ty's Eagleton Institute, "what will people do with a Liddy Dole or a Hillary Rodham or a Kitty Dukakis?"

The spouses she mentioned are those of Sen. Bob Dole, R Kan , Democrat Arkansas Gov. Bill Clinton and Massachusetts Gov Michael S Dukakis, also a Democrat. They are notable examples of women who do much more than "stand quietly at his side and smile," as Ms. Mandel described the traditional role

Elizabeth Dole is, of course, the secretary of transportation, having served previously on the White House staff Hillary

Rodham Clinton is a lawyer, a children's rights advocate and the head of the education reform commission that sparked a major school improvement program in Arkansas

Kitty Dukakis, a businesswoman, headed the governor's task force on homelessness and has worked on refugee programs as well as being one of her husband's best fund raisers

Jeanne Simon was an Illinois legislator when she married her husband, Paul, now senator from Illinois and a Democratic presidential hopeful She is also an author, an activist on issues from arms control to library funding and almost last year's Democratic candidate for lieutenant governor

Hattie Babbitt is a trial lawyer and "valued counselor," says her candidate husband, Bruce, the former governor of Arizona.

Ellen duPont was a foreign aid official in the first Reagan term and has run a tough but losing race for the House seat held by her husband, Pierre, before he became governor of Delaware Jill Biden, wife of Sen Joe Biden, D-Del , teaches adolescents at the Rockford Center, a home for severely retarded people

These are strong women

Even those women who appear closer to the traditional model of homemaker, mother, companion and hostess — the Barbara Bushes of both parties — are known as people who exert major influence on their husbands

Jack Kemp routinely introduces his wife, Joanne, as "the real quarterback of the Kemp family," and staff members say it was Joanne who ended hours of bickering on the direction of his announcement speech with a few clear sent ence She also reinforces his anti abortion views

Betsy Griffith, a historian of feminism, says that while she observes that for many years "male candidates encouraged their

wives to pretend indifference and ignorance of political matters, even though it's often been clear they have been full partners in political judgments and political ambitions,"

The acknowledgment of what Ms Man del calls "women's more outspoken life patterns" is a victory for candor. But, as she also observes, "It really complicates things "

When marriages are partnerships of independent, able and co-equal people, and one of them seeks the presidency, new issues are created for voters, for reporters and for both spouses

It would be fatuous to suppose that women with years of experience in governmental and/or clear views on public policy will be of no importance in governments their husbands head It would be sexist to suggest that they might not be qualified to play some formal or informal role in the administration

But the Constitution did not envisage the presidency as a dual office, and it is not clear what standards or methods are appropriate for ensuring accountability in the unelected half of these modern marriages

I am not suggesting a spouses debate But Mrs. Dole's concepts of regulatory reform, Mrs Simon's disarmament policies, Mrs. Gore's definition of porno raphy and several spouses' education theories seem legitimate areas for inquiry — either of the candidate or the spouse

As Ms. Mandel said, "We may be clear as an individual, but we've always been interested in his relationships. In earlier days, the press always worried about what first ladies wore Now, the relevant question is, 'What does she think'" —

The message to the campaign press corps — happily, no longer only "the boys on the bus" — is that our workload has just doubled

# National renewal under way

By Jim Fain
Cox News Service

WASHINGTON — Most religions celebrate renewal in spring, but none with more ebullience than Christianity.

Nature pitches in, decorating Easter's open tomb with a sunburst of beauty to symbolize the triumph of life over death, of hope as redeemer of the human condition. It is not a season for sourpusses

With a little luck, this year's reawakening may be more than ceremonial Something is stirring under the surface. Something tentative, unfocused, yet unmistakable We are beginning a mid-course correction

Reaganaut Republicans now speak fa vorably of compassion They tinker with welfare without donning rubber gloves They talk of catastrophic health insurance, job training, beefing up education, maybe even refurbishing rotting bridges, highways and tunnels

Congressional Democrats, of all people, try in fumbling but earnest ways to lower the deficit Even Gorbachev is in the act, attempting to shame Reagan into a minor arms agreement by not just accepting his old offer but raising it

Not to gush. Problems abound Except for the richest tenth, all Americans have suffered a loss in living standard since 1973 The poorest one-fifth saw real family income drop one-third between '73 and '85 Only the handful with $25 million in the bank have truly made out on Reaganomic tax cuts

Between government and corporate mismanagement, we have thrown away our competitive edge Many of us — including our children — fear they will never achieve a lifestyle equaling our own This is not the way we like to think in America.

Well, except for Easter's brief brilliance, who promised us a rose garden? If we have no shortage of terrors today — from AIDs to coors — our problems we ren't exactly in fat city Saber tooth tigers and black plague weren't fun and games either

Vietnam was a downer, as were Watergate and the ghastly murders of the Kennedys and Martin Luther King. Trauma was an inevitable result

We have been navigating the stages of grief, most recently denial With Reagan as Pied Piper, it was easy to revel in painless patriotism and borrowed wealth

Most of us felt the Great Society went ridiculously far in big daddy government We were ready to retrench But we also know government has an indispensable role in solving human problems (and not just as religious right fantasy).

We want to get cracking on schools and whatever else we need to build our own economically We abhor the growth of hunger and homelessness

Pollsters tell politicians what we are thinking, which is why Republican chairman Frank Fahrenkopf discovered the joys of compassion In 1986, we will swing back toward the political middle.

There is a spirit of realism, of pragmatism, running through the emerging presidential campaign It may symbolize a healthy reaction against the hype and fantasy of "morning in America" feel good Reaganism

Already there are signs of hard slogging new muscle in industry. We probably are not as unconquerable as we look

We are a sound and decent people who love this country and will sacrifice for it if shown the way Almost surely, we will find new forms of national service soon to harvest these patriotic impulses

# The Week's Wash

## By Veritas

DAYS OF OUR LIVES — WW doesn't usually take in washing We have enough dirty laundry of our own

But after that tourism report from Durango left town last weekend, we thought, shucks, anyone ought to be able to coordinate Gallup's tourism promotion, like the lady suggested.

So WW took on the job for a day We opened up a temporary office out on the front walk of City Hall in a booth made out of a couple of apple crates, Lucy style Our homemade sign read, "Free Tourism Infattuation — The tourism counselor is IN"

"We've come to see the revolving door," said the tired tourist.

"Yes," said his wife, a bleached blonde in sunglasses "We heard that Gallup's city administration is a regular revolving door is this the right place?"

"Well, yes," said WW "This is the City Hall But, you see, there isn't actually a spinning door. That's just a figure of speech ... er, Why don't you try the Economic Development Group Office "

After the couple frumped away, a family of six drove up in a station wagon loaded down so the back bum per nearly dragged

"We've just been to the Grand Canyon," said the young father expectantly, "but we heard you have something just as good here "

WW stared incredulously

"Red Rock Park is what I'm talking about," said the fellow. "Over in Flag they told us they heard Red Rock Park has cracks in it the size of the Grand Canyon, and we've come to see them That must really be something "

"Well," WW welled, "we never thought of showing them off as a tourist attraction. But, what the heck Go down here two blocks and hang a right The park is about seven miles out of town"

This tourism promotion stuff was going to be really easy.

The next tourist was a lone lady in a VW Rabbit.

"I'm a science teacher," she said cheerfully, "and someone told me your mayor's office has been appealing in a vacuum. I'm interested to see how that works Can you direct me?"

"You'll have to hurry," WW told her "Just inside and to the left. But I have a feeling you're too late."

It was good to know that word about Gallup had spread so well, and it was fun meeting people and giving them directions, until two tall, strong, they suit-and-tie types came by

"I'm agent Fyannnis and this is agent Stanfran," one said, flashing open a dark wallet with gold leaf and fine black printing inside "We're here to investigate your City Coun cil."

"R r right in there," WW stam mered "But it's not in session just now C-can I direct you to any par ticular member?"

"We have received a report," said the other one, "that the council has been taken over by the Mexican Mafia What can you tell us about that?"

This was a scary Word sure travels

AS THE WORLD TURNS — Our no-prize turkey naming contest (Pg. 1 Thursday) is going slow Naturally we're beating out all the many Roe, Garrey, Evan, Peter, Paterson, Ivan, Bob and Eddie entries — and that doesn't leave much.

fast

"Well, um, er, the new council hasn't met yet. But the new mayor is known for shooting first and asking questions later "

They patted the bulges under their coats

"B-but he doesn't take office until May 5," WW hurried on. "He's already taken one straw vote on replacing the city manager, however "

"That may be it," said agent Stanfran. "Did anything happen that might support our tip?"

"Well, it's only one instance, and it's pretty controversial," WW equivocated, "and I can't say if it's the start of a trend. But you can decide for yourself.

"The vote was Munoz, Mendoza, and Gutierrez on one side, and Richards and Hight on the other "

"Thank you," they said, striking into the city building.

Soon the science teacher came back out, a little red-faced. WW asked if she needed any further help.

"I told one of the secretaries that I had just seen the world's largest Navajo rug out at Chichiltoboto and I had heard that in Gallup you had the world's biggest seer," the burst seat.

"She gave me this poem and told me you probably wrote it, since you're in charge of coordinating all Gallup's tourism literature now."

WW took the poem and found the fourth-generation Xerox copy of a 48-line series of couplets titled "The Ballad of the 'Big Zero' " No, WW didn't write it, we told her It's the kind of thing we might try, but this one's not in our style

Far be it from WW to allude to the former mayor's relatives working in City Hall, mention his church affiliation, or write a lame rhyme such as, "To the victor the spoils ... if you use a little oil " Hercrat!

However, WW told the science teacher, after Gallup's recent epitvote, name-calling mayoral election we did receive a copy of the ballad by mail Assuming it had been sent for purposes of critical review, we gave the tourist our professional opinion.

The author and/or ghost writer displayed, extensive local background, and long memory. Although the piece never will take a place among the world's great verse, or even Gallup's tourism literature, it surely will become part of Gallup lore, particularly the ending

"You can fool some people,
but maybe not all,
That 71 percent may ask for recall
So don't get too anxious
and don't ride too high,
For that mighty position
may just pass you by
Yes, Eddie had it all,
the famous Bara
But now we really know
who is the 'Big Zero' "

# Soviet economic statistics must become more reliable

The New York Times

The staff of the National Security Coun cil ran amok in the Iran-contra affair President Reagan conceded that much even before appointing the Tower board to investigate what happened The Tower report subsequently warned that the NSC staff, so deeply engaged in hostage ransom and Nicaraguan intrigue, must never again become "operational" In other words, it is proper for the staff to make and coordinate policy, but dangerous to execute it.

Yet with only a paragraph of explanation, the Tower board recommended against any law forbidding the abuse Words like "operation" are difficult to define in practice and statute, the report said. "A legislative prohibition might prevent some future president from making a very constructive use of the NSC staff "

That proposition is not self-evident Congress must examine it Usually, legislation couldn't solutions to problems caused by inadequate individuals is un fair But covert operations provides a

notable exception Reagan now bans such covert activity by the NSC staff, but the Iran-contra affair shows how easily such bans can be ignored or secretly changed

Congress prohibited covert operations in Nicaragua by intelligence agencies The Reagan administration violated this ban by ordering the NSC staff was not an intelligence unit under the law and then running the forbidden operations through Oliver North and national security adviser John Poindexter

It should be easy to close this loophole for keeps The statute might simply specify that the NSC staff is covered by laws that apply to the CIA and other agencies Even more directly, it might tell Congress to put on United States agency may conduct covert operations forbidden by Congress Tower and his colleagues concluded the write the White House machinery free of red tape But their solution — simple trust — has already been violated by this administration Reagan can simply countermand his new executive order with a whisper

## Independent

(USPS 213-300)

| John K Zollinger | Robert C. Zollinger | D Reed Eckhardt |
|---|---|---|
| *Publisher* | *Vice President* | *Managing Editor* |

Additional News Offices

THE DAILY INDEPENDENT Member Beck, AZ 86515
(505) 371 5443

THE GALLUP INDEPENDENT Gallup, NM 87301 (505) 863-6611 Subsbla New Mexico (505) 548-3717

EASTERN NAVAJO BUREAU, Thoreau, NM 87323
(505) 371 5443

Published daily except Saturday and holidays by The Gallup Independent Co 500 N North at Wilson (North Old 666) Wire service of the Associated Press and The New York Times Subscription rates Home delivery by carrier or motor route $5 25 per month in the trade zone Single copy 25¢ weekdays and 50¢ weekends By mail $7 80 a year, $36 90 for six months, POSTMASTER Send address changes to THE GALLUP INDEPENDENT, P O Box 1210 Gallup, N M 87301 Entered as second class matter at the post office in Gallup, N M 87301

The desert shall rejoice and blossom as the rose

*Isaiah 35*

764 P.2d 499

**Donna SALSWEDEL,
Plaintiff–Appellant,**

v.

**ENERPHARM, LTD., a New Mexico
Partnership, Defendant–Appellee.**

**No. 9813.**

Court of Appeals of New Mexico.

Oct. 11, 1988.

William S. Ferguson, Ferguson & Lind, P.C., Albuquerque, for plaintiff-appellant.

Don E. Lepley, Butt, Thornton and Baehr, P.C., Albuquerque, for defendant-appellee.

William H. Carpenter, Carpenter & Goldberg, P.A., Albuquerque, for amicus curiae N.M. Trial Lawyers Ass'n.

## OPINION

MINZNER, Judge.

Plaintiff appeals from the trial court's decision granting defendant's motion for summary judgment and dismissing her negligence action with prejudice. At the time of her accident, plaintiff was an employee of Nuclear Pharmacy, one of three corporations which formed defendant partnership Enerpharm. Plaintiff contends that her action is not barred by NMSA 1978, Section 52-1-6(D) (Repl.Pamp.1987), because Enerpharm is a "person other than [her] employer" within the meaning of the Workers' Compensation Act. We invited the participation of amicus curiae and scheduled oral argument. We now reverse.

## BACKGROUND.

Enerpharm was organized for the purpose of acquiring, improving, and maintaining real property located in Bernalillo County. Nuclear Pharmacy manufactures pharmaceutical supplies. It leased a building and an adjacent parking lot from Enerpharm.

In the course and scope of her employment, plaintiff parked her car in the parking lot. On December 30, 1982, she slipped and fell on layers of ice covered by newly-fallen snow and sustained a severe head injury.

Plaintiff's complaint alleged that Enerpharm negligently maintained the sprinkler system, creating thick layers of ice on the pavement. Snow then covered the ice. Plaintiff sought judgment against the partnership; she did not join the partners.

In its answer, defendant raised the affirmative defense that plaintiff's exclusive remedy was under the New Mexico Workers' Compensation Act. *See* § 52-1-6(D). The trial court apparently granted summary judgment because it considered the employer and the partnership in which it participated essentially the same defendant, making plaintiff's only possible cause of action a claim for workers' compensation benefits. Plaintiff claimed workers' compensation benefits and collected those benefits from Nuclear Pharmacy during November and December of 1984 and January of 1985. The trial court conditioned its order dismissing plaintiff's negligence action on the filing of a claim for workers' compensation benefits and the admission by Nuclear Pharmacy and its workers' compensation carrier that plaintiff was injured in the scope and course of her employment. At oral argument before this court, counsel for defendant advised the panel that plaintiff's entitlement to workers' compensation benefits had been settled as a result of a suit filed against Nuclear Pharmacy pursuant to the trial court's condition.

On appeal, plaintiff asserts that the trial court erred in granting summary judgment on the issue of Enerpharm's liability because material issues of fact remain. She argues, first, that Nuclear Pharmacy may not be immune from suit under Section 52-1-6(D), because Nuclear Pharmacy was acting in a "dual capacity" or has a "dual persona." Second, plaintiff argues that even if Nuclear Pharmacy is immune from suit, Nuclear Pharmacy's immunity cannot be extended to Enerpharm or to the partners in Enerpharm other than Nuclear Pharmacy.

For the reasons that follow, we conclude that, under some circumstances, a partnership in Enerpharm's position is subject to suit. We conclude that summary judgment in favor of Enerpharm was inappropriate and remand for factual determinations on several issues.

## DISCUSSION.

Under Section 52-1-6(D), both an employer and an employee covered under the Workers' Compensation Act (Act) are deemed to have surrendered any right to

seek "any other method, form or amount of compensation or determination thereof" outside the provisions of the Act. However, the same subsection explicitly states: "Nothing in the ... Act, however, shall affect or be construed to affect, in any way, the existence of or the mode of trial of any claim or cause of action which the workman has against any person other than his employer. ..." Clearly, the Act intends to preserve an injured worker's right to pursue an action against a third party.

The dispositive appellate issue is whether a partnership in which the employer participates can ever be considered a third party for purposes of Section 52–1–6(D). We hold that the possibility exists and remand for further proceedings to determine whether this is such an instance.

Our initial inquiry is whether Enerpharm can be considered plaintiff's employer within the meaning of Section 52–1–6(D). The trial court apparently determined that, as a matter of law, Enerpharm had to be considered the same entity as plaintiff's employer, Nuclear Pharmacy, because of the relationship between Enerpharm and Nuclear Pharmacy. We disagree.

■ The Uniform Partnership Act, adopted in New Mexico and appearing at NMSA 1978, Sections 54–1–1 to –43 (Repl. Pamp.1988), recognizes that a partnership is a legal entity distinct from its member partners for some purposes. *See Loucks v. Albuquerque Nat'l Bank*, 76 N.M. 735, 418 P.2d 191 (1966). For example, a partnership is a distinct legal entity to the extent that it may sue or be sued in the partnership name. *Id.* The situation presented here turns on whether a partnership is a legal entity distinct from one of its individual members.

■ However, we believe resolution of the question of whether Enerpharm can be considered plaintiff's employer for purposes of Section 52–1–6(D) depends not so much upon the relationship between Enerpharm and Nuclear Pharmacy, but rather upon the relationship between Enerpharm and plaintiff. The crucial determination is whether an employment relationship exist-

ed between Enerpharm and plaintiff. *See Swiezynski v. Civiello*, 126 N.H. 142, 489 A.2d 634 (1985); *Lindner v. Kew Realty Co.*, 113 A.D.2d 36, 494 N.Y.S.2d 870 (1985). The factors to be considered in this determination are whether Enerpharm had a right to control plaintiff's performance and whether there was a corresponding right in plaintiff to seek remuneration from Enerpharm.

We therefore vacate the decision of the trial court and remand for a factual determination as to whether Enerpharm can be considered plaintiff's employer. If an employment relationship is found, then Section 52–1–6(D) clearly presents a bar to this suit.

Our inquiry does not end here, because, while Enerpharm can be sued as an entity, *Loucks v. Albuquerque Nat'l Bank*, it can be held liable only for the commission of a tort by a member partner or other agent. *Gatley v. Deters*, 128 Misc.2d 209, 489 N.Y. S.2d 684 (1985). According to New Mexico's Uniform Partnership Act, Section 54–1–13, the partnership is liable for the wrongful conduct of a partner *"to the same extent"* (emphasis added) as the offending partner. Thus, if plaintiff's claim is based solely or partially upon negligence attributable to her employer, Nuclear Pharmacy, the trial court must decide whether Enerpharm can claim derivative immunity with respect to that portion of liability pursuant to Section 54–1–13.

In deciding whether Enerpharm can claim derivative immunity from Nuclear Pharmacy, the first issue is whether Nuclear Pharmacy is immune from suit under Section 52–1–6(D). This issue must be decided, because Enerpharm cannot derive immunity from Nuclear Pharmacy if Nuclear Pharmacy does not have immunity.

Plaintiff asserts that Nuclear Pharmacy may not be immune from suit because either the "dual capacity" doctrine or the "dual persona" doctrine applies.

■ The "dual capacity" doctrine imposes liability outside the workers' compensation statutes where the facts show that employer's conduct contributed to the inju-

ry sustained and is conduct of a nature not associated with the employer's functions as an employer. 2A A. Larson, *The Law of Workmen's Compensation* § 72.81(a) (1988). Larson has criticized the "dual capacity" doctrine as loose and over-extended. *Id.* It has also been criticized in case law and rejected in favor of the "dual persona" doctrine. *See Henning v. General Motors Assembly Div.*, 143 Wis.2d 1, 419 N.W.2d 551 (1988). It is held with virtual unanimity that when the dual roles are those of employer and owner/occupier of land, they are not sufficiently distinct to allow imposition of liability. *See generally* Larson, *supra*, § 72.82; *see, e.g., Royster v. Montanez*, 134 Cal.App.3d 362, 184 Cal. Rptr. 560 (1982).

■ In *Royster v. Montanez*, the California Court of Appeals specifically disapproved of application of the "dual capacity" doctrine in cases where an employer was also a landowner and the basis for liability was one connected with the maintenance and repair of property. As the *Royster* court noted:

> [A] substantial proportion of work-related injuries are caused, or plausibly can be alleged to be caused, by a dangerous condition of the place of employment. If the dual capacity doctrine were to be construed so broadly as to create premises liability in every such instance, little would be left to which exclusivity of remedy [provision of the workers' compensation statute] could attach.... [T]he balance of reciprocal concessions which is the foundation of the workers' compensation system would be seriously disturbed.

134 Cal.App.3d at 373, 184 Cal.Rptr. at 566. We agree, and, therefore, will not apply the "dual capacity" doctrine in cases such as this. *See also Sharp v. Gallagher*, 95 Ill. 2d 322, 69 Ill.Dec. 351, 447 N.E.2d 786 (1983).

■ Under the "dual persona" doctrine, an employer may become a third person, vulnerable to a tort suit by an employee, if, and only if, he possesses a second persona completely independent from and unrelated to his status as employer. Larson, *supra*,

§ 72.81; *Henning v. General Motors Assembly Div.*

We believe an employer becomes vulnerable to a tort action by an employee and loses the immunity of Section 52-1-6(D) if the employer possesses a second persona sufficiently independent from and unrelated to the status of employer. Therefore, we will apply the "dual persona" doctrine to cases such as this. Larson, *supra*, § 72.81; *Henning v. General Motors Assembly Div.* The employer's immunity from the additional, unpredictable tort liability of a third party should extend as far as, but only as far as, the employer has a reasonable expectation of immunity.

Never allowing the employer to be sued as a third party would give rise to the same type of situation we noted in *Hernandez v. Home Educ. Livelihood Program, Inc.*, 98 N.M. 125, 645 P.2d 1381 (Ct.App.1982). There, summary judgment was reversed because the trial court erroneously equated the fact of employment with the exclusivity provisions of the Workers' Compensation Act. This court rejected an argument that would have required us:

> [T]o abolish any tort claim for an employee's injury, even if it resulted from an automobile accident in which the employer, while returning from church, runs into the employee who is on his way to a baseball game ... is a result never contemplated nor considered by the work[er]'s compensation enactment.

98 N.M. at 128, 645 P.2d at 1384.

Whether Nuclear Pharmacy has a "dual persona," which is not immune from suit, is a question of fact which must be resolved by the trial court on remand. If Nuclear Pharmacy is found to be immune, then the issue of whether the immunity extends to shield Enerpharm from suit will arise.

A partnership is liable for tortious acts committed in the ordinary course of partnership business by a member partner or other agent. *See* § 54-1-13. While a partnership can be sued as an entity, it can only be held liable for the commission of a tort by a member partner or other agent. *Gatley v. Deters.* Although in this case the claim is described as based on an alleged

tortious act of the partnership, plaintiff is actually asserting negligence on the part of an agent of the partnership, which may be imputed to the other partners.

■ However, immunity from liability is strictly construed, and is not to be extended from the individual partner to the partnership. *Mathews v. Wosek,* 44 Mich.App. 706, 205 N.W.2d 813 (1973); *Eule v. Eule Motor Sales,* 34 N.J. 537, 170 A.2d 241 (1961); *cf. Restatement (Second) of Agency* § 217(b) (1958) (a principal is not entitled to rely on the immunity granted its agent). Although the law permits the attribution of one partner's fault to another, it does not necessarily follow that the partnership and other partners must be given immunity from suit when the partner whose negligence gives rise to suit is immune from suit. A distinction can be made between fault or culpability and liability for damages.

We believe the question of whether the partnership and the other partners should also be deemed immune as a matter of law is a policy question. *See Mathews v. Wosek.* We answer the question in favor of the worker. *Id.; Eule v. Eule Motor Sales.*

> Good reason exists for preserving the right of an injured worker to sue a third person to the maximum extent that such actions are consistent with workers' compensation laws. The fixed dollar ceiling on benefits under the workers' compensation laws are the result of a trade-off of certain liability of the employer for reduced awards for the employee. Injured workers are entitled not only to recovery against employers under workers' compensation laws, but also against third parties under tort law.

*Lyon v. Barrett,* 89 N.J. 294, 305, 445 A.2d 1153, 1158 (1982). In *Lyon v. Barrett,* an employee was allowed to recover against the individual who owned the building and rented part of it to his own professional corporation, which was plaintiff's employer. Plaintiff had recovered workers' compensation benefits from the professional corporation.

When an employer enters into a separate, distinct investment, such as a partnership to acquire and manage real property, we see no reason why a reasonable expectation of immunity extends to the actions of that separate endeavor. The "dual persona" doctrine allows a third party suit against an employer when the facts demonstrate the employer's status as a "separate legal entity." The central requirement is that there be a separate and distinct legal persona rather than merely a second theory of liability in the same person. *See* Larson, *supra,* § 72.61(c).

Notwithstanding the foregoing, we note that, under some circumstances, the partnership and partners must be considered one entity. *Cipriano v. FYM Assocs.,* 117 A.D.2d 770, 499 N.Y.S.2d 101 (1986). For example, where the partnership is the alter ego of the employer partner, it would be appropriate to view both the partnership and the employer partner as immune.

In *Cipriano v. FYM Assocs.,* a New York appellate court found that the partnership and the partners were acting solely in furtherance of partnership business because the partnership agreement specified that its purpose was to purchase and develop the very premises at issue, one of the partners was retained to construct those improvements, that partner kept the partnership record and was reimbursed by the partnership, and there were only two partners: the building company itself and an officer of the building company who supervised the work. In such a fact pattern, there is no dual persona. There may be other fact patterns as well, in which for purposes of Section 52–1–6(D), a partnership and its partners must be considered one entity. *See Sharp v. Gallagher.* This we need not decide.

On the record before us, there are several issues of fact that make summary judgment inappropriate. The first issue is whether Enerpharm is plaintiff's employer. If an employment relationship exists between plaintiff and Enerpharm, Enerpharm is clearly immune from suit under Section 52–1–6(D). Another issue is whether Nuclear Pharmacy has a dual persona as part-

ner that is independent from and unrelated to its status of employer to the extent that Nuclear Pharmacy would not be immune from suit in its partnership capacity. This determination is necessary, because, if Nuclear Pharmacy is not immune from suit, Enerpharm cannot derive any immunity from Nuclear Pharmacy. Finally, assuming that Nuclear Pharmacy is immune from suit as partner, the remaining issue is whether Enerpharm and Nuclear Pharmacy are sufficiently separate and distinct entities, so that Nuclear Pharmacy's immunity from suit cannot be extended to Enerpharm.

We do not decide, because the issue is not before us, whether Nuclear Pharmacy will be liable for any portion of a judgment rendered against the partnership, in the event that partnership assets prove insufficient.

CONCLUSION.

For these reasons, we conclude that a suit against Enerpharm is not necessarily barred by Section 52–1–6(D). Genuine issues of material fact exist regarding Enerpharm's relationship with plaintiff and with Nuclear Pharmacy. These issues must be decided before a determination can be made concerning Enerpharm's immunity from suit.

The order granting summary judgment is reversed, and the case is remanded for further proceedings consistent with this opinion. Plaintiff shall recover her appellate costs.

IT IS SO ORDERED.

BIVINS and APODACA, JJ., concur.

764 P.2d 504

Phillip URIOSTE, Claimant–Appellee,

v.

Mark SIDERIS, d/b/a Buffalo Builders, and Ohio Casualty Insurance Company, Respondents–Appellants,

and

Furr's, Inc. and Texas General Indemnity, Respondents–Appellees.

No. 10403.

Court of Appeals of New Mexico.

Oct. 20, 1988.

Joe W. Wood, Hinkle, Cox, Eaton, Coffield & Hensley, Santa Fe, for claimant-appellee.

David L. Skinner, Montgomery & Andrews, P.A., Albuquerque, for respondents-appellants.

Kathleen C. Horan, Hatch, Beitler, Allen & Shepherd, P.A., Albuquerque, for respondents-appellees.

## OPINION

DONNELLY, Chief Judge.

Employer, Mark Sideris d/b/a/ Buffalo Builders, appeals from the decision of a hearing officer of the Workers' Compensation Division awarding disability benefits and finding claimant, Phillip Urioste, temporarily totally disabled as a result of two

accidents: one occurring while claimant was working for Sideris and the other occurring while claimant was working for a subsequent employer, Furr's, Inc. We answer two of employer's claims summarily and discuss (1) whether the initial accident arose out of claimant's employment; (2) whether there is substantial evidence to support the finding that claimant was disabled during his employment; (3) whether the hearing officer erred in allocating liability; and (4) whether the hearing officer erred in awarding attorney fees. We affirm.

Claimant was employed by Sideris during the summer of 1986 as a laborer. On August 18, 1986, claimant was working with another employee of Sideris installing insulation in a building being remodeled. Two plumbers, not employed by Sideris, were installing a bathtub at the same location. The plumbers requested claimant to help them lift the bathtub. While rendering this assistance, claimant injured his back. Although claimant worked the remainder of that day, the next morning he experienced severe lower back pain and went to a hospital emergency room for treatment. The doctor prescribed medication and advised claimant to rest.

Claimant testified that after seeing the doctor, he spoke to Sideris, informed him of the injury, and requested a wage advance to pay for medication prescribed by his physician. Thereafter, claimant missed three days of work. When he returned to work, claimant was told that he and the other laborers would only be needed on the project for the remainder of the week.

After claimant was laid off, he was hired by Furr's. He worked first in a delicatessen section and later was assigned to prepare signs and graphics. During his employment with Furr's, claimant complained of back pain to his supervisor. On October 4, 1986, claimant further injured his back while erecting a sign. Claimant was unable to return to work and filed a worker's compensation claim against Sideris on March 10, 1987; on April 3, 1987, he filed an amended claim joining Furr's in the same action.

## I. ISSUES ANSWERED SUMMARILY

(a) The parties do not dispute that the applicable standard of review of an appeal from the decision of a hearing officer in a worker's compensation action is governed by the whole record standard of review. Thus, we apply the whole record standard of review. *Tallman v. ABF,* N.M. (Ct.App. 1988). *See also Strickland v. Coca–Cola,* 107 N.M. 500, 760 P.2d 793 (Ct.App.1988).

■ (b) Sideris argues that the hearing officer erred in finding that he had actual knowledge of the accidental injury sustained by claimant on August 18, 1986, and that the evidence was insufficient to support the challenged finding. A claimant is not required to give written notice of an accident where the employer or any superintendent or foreman or other agent in charge of the work in connection with which the accident occurred had actual knowledge of its occurrence. NMSA 1978, § 52–1–29(B) (Repl.Pamp.1987). The determination of whether the employer had actual knowledge is made from a consideration of the totality of the facts and circumstances. *Powers v. Riccobene Masonry Constr., Inc.,* 97 N.M. 20, 636 P.2d 291 (Ct.App.1980); *Rohrer v. Eidal Int'l,* 79 N.M. 711, 449 P.2d 81 (Ct.App.1968).

■ The record indicates a conflict in the testimony concerning whether claimant orally notified Sideris that he injured his back while lifting a bathtub at the construction site. Claimant testified that he told Sideris of the circumstances of his injury. He also testified that he gave Sideris a note from his doctor requesting that he be excused from work for several days because of his back injury. This testimony was corroborated by another workman. Sideris acknowledged that he was informed that claimant had injured his back, but testified that he did not know the cause of the injury. He also testified that he did not recall discussing claimant's need for a prescription, nor did he recall seeing a note from claimant's doctor.

Where the testimony is conflicting, the issue on appeal is not whether there is evidence to support a contrary result, but rather whether the evidence supports the findings of the trier of fact. *Hernandez v. Mead Foods, Inc.*, 104 N.M. 67, 716 P.2d 645 (Ct.App.1986); *Bagwell v. Shady Grove Truck Stop*, 104 N.M. 14, 715 P.2d 462 (Ct.App.1986). The whole record supports the finding of the hearing officer as to this issue.

## II. ARISING OUT OF THE EMPLOYMENT

■ The hearing officer found that claimant's August 18, 1986 injury arose out of and in the course of his employment with Sideris. The language "in the course of employment" refers to the time, place, and circumstances under which the accident occurred. *Velkovitz v. Penasco Indep. School Dist.*, 96 N.M. 577, 633 P.2d 685 (1981). A worker's injury arises out of his employment if the injury is caused by a risk to which the worker has been subjected arising from his employment. *Barton v. Las Cositas*, 102 N.M. 312, 694 P.2d 1377 (Ct.App.1984). For an injury to arise out of the employment, it must be apparent to a rational mind, upon consideration of all the circumstances, that there is a causal connection between the conditions under which the work is required to be performed and the resulting injury. *Gutierrez v. Artesia Pub. Schools*, 92 N.M. 112, 583 P.2d 476 (Ct.App.1978) (*quoting In re McNicol*, 215 Mass. 497, 102 N.E. 697 (1913)). The question of whether a worker's injury arises out of his employment is a question to be determined by the trier of fact. *See id.* Where the historical facts of the case are undisputed, however, the question of whether the accident arose out of the employment is a question of law. *Edens v. New Mexico Health & Social Servs. Dep't*, 89 N.M. 60, 547 P.2d 65 (1976).

■ Sideris argues that the dispositive facts of this case are undisputed. Our review of the record indicates that while some of the historical facts are undisputed, other key evidence is conflicting. Sideris points to evidence that indicates claimant was working for Sideris installing insulation, that the plumbers were not employed by Sideris, and that claimant's act of assisting the plumbers did not constitute a specifically assigned job duty. Other testimony, however, indicated that claimant had on other occasions been instructed to assist plumbers, that the project was a rush job, and that claimant had been instructed to do what was necessary in order to get the project done. Claimant also testified that he could not complete his work until the plumbers had completed their work.

Where the ultimate effect of claimant's act of helping others is to advance his own employer's work, by removing obstacles to the work, and where the employer has not specifically prohibited the worker from giving such assistance, the employer may be held liable under the Workmen's Compensation Act for disability resulting from an accidental injury. *Cf. Feldhut v. Latham*, 60 N.M. 87, 287 P.2d 615 (1955). *See generally* IA A. Larson, *The Law of Workmen's Compensation* § 27.20 (1985). This is such a case.

Because the material facts were in dispute, it was the duty of the hearing officer to weigh the evidence and determine whether the injury arose out of and in the course of claimant's employment. *See Neel v. State Distributors, Inc.*, 105 N.M. 359, 732 P.2d 1382 (Ct.App.1986). The question on appeal is not whether there was evidence to support an opposite result, but instead, whether the evidence supported the trial court's findings. *Id.* Based on all the testimony, there is substantial evidence in the record as a whole to support the findings.

## III. TEMPORARY TOTAL DISABILITY

The hearing officer found that, except for a period of one and one-half weeks, claimant was temporarily totally disabled from August 18, 1986 until the date of the hearing. Because the disability in this case manifested itself after May 21, 1986, the provisions of 1986 N.M. Laws, ch. 22 (the Interim Act) apply. The Interim Act de-

fines temporary total disability as "the inability of the workman, by reason of accidental injury arising out of and in the course of his employment, to perform his duties prior to the date of his maximum medical improvement." NMSA 1978, § 52-1-26 (Cum.Supp.1986). The parties have agreed that, as of the day of the hearing, claimant had not reached maximum medical improvement. There is also agreement that claimant was temporarily totally disabled after October 4, 1986. The dispute regarding the award of temporary total disability concerns the period from August 18, 1986, until October 4, 1986.

Under the former workmen's compensation statute, the definition of total disability required proof of two factors: (1) the workman must be totally unable to perform work he was doing at the time of the injury; and (2) the worker must be wholly or partially unable to perform any work for which he is fitted by age, education, training, general physical and mental capacity and previous work experience. NMSA 1978, § 52-1-24 to -25 (Orig.Pamp.); *Salcido v. Transamerica Ins. Group*, 102 N.M. 217, 693 P.2d 583 (1985). The first prong of the former test of disability is similar to the definition of temporary total disability contained in the Interim Act. The case law applicable to the former statute states that the primary test for disability is the capacity to perform work. *See Medina v. Zia Co.*, 88 N.M. 615, 544 P.2d 1180 (Ct.App. 1975). The issue thus presented is whether, after the accidental injury, the worker is able to perform his job duties.

■ Sideris argues that because claimant was able to perform his job duties between August 18, 1986, and October 4, 1986, these facts preclude a finding of disability. Sideris contends that post-injury employment is evidence relevant to whether a claimant is able to perform the work he was doing at the time of the accident. *See Schober v. Mountain Bell Tel.*, 96 N.M. 376, 630 P.2d 1231 (Ct.App.1980). Post-injury employment, however, does not, as a matter of law, preclude a finding of total temporary disability. *See Amos v. Gilbert W. Corp.*, 103 N.M. 631, 711 P.2d

908 (Ct.App.1985). Whether the evidence of post-injury employment is indicative of a worker's ability to perform work turns upon the facts of each particular case. *Id.*

■ Here the evidence was uncontroverted that claimant returned to work for Sideris five days after injuring his back. Sideris presented evidence that claimant performed all his duties without any difficulty, that he did not request light duty, and that he did not ask for assistance from his co-workers. Claimant testified, however, that he did not perform the same duties, that he avoided any significant lifting, and that he only assisted in installing metal door frames. After he was laid off from work with Sideris, claimant obtained employment with Furr's. The record indicates that claimant performed all his job duties and did not miss any time from work while working in the delicatessen department of Furr's, but that after being assigned to prepare graphics, he complained of back pain to his supervisor and the assistant store manager. Later, while hanging a sign, he further injured his back and was unable to return to work.

Claimant was diagnosed as having a herniated disc. Sideris contends that the medical testimony is conflicting and that certain medical evidence should be disregarded. Dr. Richard Ferber, the treating physician, testified that when he examined claimant on August 19, 1986, claimant did not report any specific traumatic event. Dr. Bankat Narayan, who performed surgery to remove the herniated disc, testified that claimant's herniated disc was caused by his assisting in lifting the bathtub. Dr. Robert W. Benson, an orthopedic surgeon who performed an independent medical examination on claimant, also testified that the cause of claimant's back problem stemmed from his lifting of the bathtub.

Our concern, however, is whether there is evidence on the record as a whole to support the finding of disability. In reviewing the judgment of the hearing officer, the decision will be upheld if the administrative authority has correctly adhered to applicable law, *see Conwell v. City of Albuquerque*, 97 N.M. 136, 637

P.2d 567 (1981), and if after reviewing the record as a whole, the appellate court determines that on balance, the fact finder's decision is supported by substantial evidence. *Tallman v. ABF; Cibola Energy Corp. v. Roselli*, 105 N.M. 774, 737 P.2d 555 (Ct.App.1987); *Tapia v. City of Albuquerque*, 104 N.M. 117, 717 P.2d 93 (Ct. App.1986). In addition to the medical testimony, claimant also testified that he was unable to work following his back injury at Furr's. While medical testimony is not necessary to establish the extent of disability, it may, however, constitute valid evidence on such issue. *See Hernandez v. Mead Foods, Inc.*

Reviewing the record as a whole, we determine that there was substantial evidence supporting the hearing officer's finding of temporary total disability.

### IV. ALLOCATION OF COMPENSATION

■ After finding that claimant was temporarily totally disabled, the hearing officer apportioned liability between Sideris and Furr's. Sideris contends that liability resulting from claimant's disability arising from his second accident, regardless of any preexisting condition, is fully compensable by the employer and compensation insurer at the time of the second accident. *See Gonzales v. Stanke–Brown & Assoc., Inc.*, 98 N.M. 379, 648 P.2d 1192 (Ct.App.1982). We disagree. Under our ruling in *Gonzales*, the employer and the compensation carrier at the time of the first accidental injury remain liable to claimant for compensation benefits payable to the extent of any disability resulting from the initial injury. Although the employer and the compensation carrier at the time of the second accident are liable for compensation for the disability resulting from the second accident, that amount is subject to reduction to the extent of benefits paid or payable for disability resulting from the first accidental injury. *Id.*

### V. ATTORNEY FEES

■ The final issue raised on appeal challenges the hearing officer's award of attorney fees to claimant. The judgment awarded $8,000 in attorney fees and directed that one-half of this amount be paid by each employer. All parties agreed at the hearing that in determining any award of attorney fees, the provisions of the Interim Act applied. On appeal, however, Sideris contends the provisions of the Interim Act were not applicable. In view of the fact that the parties below stipulated to the applicability of the Interim Act, we review this issue in light of the provisions of the Interim Act and determine that under the record before us the parties are bound by their stipulation. *Cf. Alber v. Nolle*, 98 N.M. 100, 645 P.2d 456 (Ct.App.1982) (stipulation as to amount of expenses and that expenses were reasonable and necessary held sufficient evidence to support a finding as to damages).

The Interim Act, subject to specific exceptions, placed the responsibility for payment of attorney fees upon the worker. *See* NMSA 1978, § 52–1–54 (Cum.Supp. 1986). It provided that "[a] workman shall be responsible for the payment of his own attorneys' fees, except that a workman shall be entitled to recover a reasonable attorneys' fee from an employer" where the employer has refused the payment of medical benefits under certain circumstances, without a reasonable basis, where the employer without a reasonable basis denies that an injury has occurred and the workman prevails on that issue, or where the employer has "acted in bad faith" with regard to handling the workman's claim. The Interim Act, Section 52–1–54, effective until July 1, 1987, was amended by N.M. Laws 1987, Chapter 235, Section 24.

The hearing officer adopted supplemental findings of fact as to attorney fees finding, among other things, that: "14. Respondents [Sideris and his insurance carrier] acted in good faith with regards to this claim"; and "15. Respondents denied an injury in this cause without a reasonable basis." The administrative order, which is the subject of this appeal and which awarded compensation and ordered payment of attorney fees, recited that "there is no finding of bad faith by the employers or its

workmen's compensation carrier but there was a denial without a reasonable basis [.]" Sideris notes that the compensation order carried forward supplemental finding no. 15. Sideris contends that supplemental finding no. 15 is not supported by substantial evidence in the record as a whole or by the remaining findings.

Both claimant and Sideris submitted requested findings of fact and conclusions of law as to liability. At the close of the hearing on attorney fees, the hearing officer advised the parties that they might submit findings of fact and conclusions of law as to attorney fees, but should do so within a stated time. Neither claimant nor Sideris did so. The findings submitted as to liability do not specifically relate to the issue of the award of attorney fees or bear upon the issue of whether respondents denied claimant's injury without a reasonable basis.

The failure of Sideris to submit requested findings of fact and conclusions of law on the issue of the reasonableness of the award of attorney fees or as to the issue of whether it unreasonably denied claimant's injury precludes evidentiary review of the evidence on these issues. *See Pedigo v. Valley Mobile Homes, Inc.*, 97 N.M. 795, 643 P.2d 1247 (Ct.App.1982); *Martinez v. Martinez*, 101 N.M. 493, 684 P.2d 1158 (Ct.App.1984). As set forth in SCRA 1986, 1–052(B)(1)(f), "[a] party will waive specific findings of fact and conclusions of law if he fails to make a general request therefor in writing, *or if he fails to tender specific findings and conclusions.*" (Emphasis added.) Consideration of the issue on appeal requires a review of the evidence at trial. A party who does not request findings of fact and conclusions of law cannot on appeal obtain a review of the evidence. *McNabb v. Warren*, 83 N.M. 247, 490 P.2d 964 (1971). Thus, we do not review Sideris' contention. *See id.*

We affirm the order of the hearing officer on the award of attorney fees.

## VI. CONCLUSION

The order of the administrative hearing officer is affirmed. Claimant is entitled to attorney fees on appeal against Sideris in the amount of $2,000.

IT IS SO ORDERED.

MINZNER and APODACA, JJ., concur.

764 P.2d 510

**In The Matter of the ESTATE OF Baudilio BOWLES, Deceased.**

**Pete VIGIL, Tony Vigil, Art Vigil, Polly Trego, Isidro Vigil, Marie Vigil and Jane Salls, heirs of and successors in interest to Julianita B. Vigil, Deceased, Plaintiffs–Appellants,**

v.

**Delfina BOWLES, Personal Representative of the Estate of Baudilio Bowles, Deceased, Defendant–Appellee.**

**No. 10927.**

Court of Appeals of New Mexico.

Nov. 1, 1988.

740

James V. Noble, Jr., Santa Fe, for plaintiffs-appellants.

Thomas A. Simons, IV, Santa Fe, for defendant-appellee.

## OPINION

ALARID, Judge.

Plaintiffs appeal the trial court's orders: 1) granting defendant summary judgment and denying their own motion for summary judgment; and 2) construing the testator's will as devising to plaintiffs' deceased a life estate in a portion of the income from real property owned by testator. Our calendar notice proposed summary affirmance. Plaintiffs have timely filed a response to proposal for summary affirmance. Defendant has timely filed a memorandum in support of proposed summary affirmance. Not persuaded by plaintiffs' memorandum, we affirm the trial court.

■ In construing a will, the court must attempt to give effect to the testator's intent. *Gregg v. Gardner*, 73 N.M. 347, 388 P.2d 68 (1963). The testator's intent should be ascertained from the instrument itself. *In re Estate of Kyreazis*, 103 N.M. 2, 701 P.2d 1022 (Ct.App.1984); NMSA 1978, § 45-2-603. Technical rules of construction should be resorted to only if the language of the will is ambiguous or the testator's intent is for any reason un-

certain. *Gregg v. Gardner*. The parties agree that the testator's will is clear and unambiguous.

■ In paragraph 6.2 of his will, the testator devised to his sister, the plaintiffs' deceased, "one-half of any income, rents or profits from any real property ... located in Bull Creek (Valle del Toro) or Colonias, New Mexico...." Plaintiffs argue that the above devise manifests a testamentary intent that plaintiffs' deceased receive one-half of the real property in fee simple. Plaintiffs rely on the rule, "[A]n absolute gift of the income of realty, in the absence of anything to indicate a contrary intention, passes the realty." 4 W. Bowe & D. Parker, *Page on the Law of Wills* § 33.21 (1961). *See* Annotation, *Grant or Gift of Income as Carrying an Absolute Interest in the Property*, 174 A.L.R. 319 (1948).

But a contrary intent appears in this case. The will contains a residuary bequest in which testator left to his children, if his wife predeceased him, "[M]y interest in any real property owned by me at the time of my death, which I inherited from my family, located in Bull Creek and/or Colonias, San Miguel County[.]" There is no dispute that the property described in this provision is the same real estate referred to in the bequest to Julianita Vigil.

Plaintiffs attach significance to the fact that the gift to the testator's children was a residuary bequest. The devise to the children was by its terms "in addition to those given and devised under Article VI herein[.]" But that language does not mean that the bequest to Juanita Vigil must be construed as broadly as possible. Rather, we look for a reasonable construction that reconciles the provisions devising the property. *See In re Estate of Martin*, 97 N.M. 773, 643 P.2d 859 (1982).

To construe the residuary bequest to the children as of only one-half the fee is to ignore the plain words of the will. But the bequests to Julianita and to the children can be reconciled if the fee estate is devised to the children and the bequest to Julianita is given its natural interpretation of simply one-half of the income, and noth-

ing further. "If a gift of income, is followed by a gift over of the corpus of the property, such gift over shows that the gift of income was not intended to pass the entire property." *Page on the Law of Wills, supra,* § 33.21.

By the same token, the devise to the children implies that the devise to Julianita was only a life estate. It would be unreasonable to infer that the testator intended Julianita and her heirs to continue to receive one-half of the income from the property in perpetuity. Such an arrangement could readily lead to serious complications in future management of the property. The trial court correctly construed testator's intent as devising to Julianita a life estate in a portion of the income from real property left by testator in determining that title to the realty vested in testator's children.

The construction of the devise to Julianita as a life estate in the income is also consistent with what the will provides in the event the testator's wife survived him. The will states that she would receive "the remainder of all property over which I have the power of testamentary disposition." It does not require a strained construction to include within that "remainder" the ownership interest in the Bull Creek or Colonias property, subject to Julianita's life estate in the income. *See In re France' Estate,* 75 Pa. 220 (1874).

CONCLUSION

The orders of the trial court are affirmed.

IT IS SO ORDERED.

DONNELLY, C.J., and HARTZ, J., concur.

764 P.2d 873

**REGENTS OF the UNIVERSITY OF NEW MEXICO, Plaintiff–Appellant,**

v.

**Vincent LACEY and Liberty Mutual Insurance Company, Defendants–Appellees.**

No. 17523.

Supreme Court of New Mexico.

Nov. 21, 1988.

Mickey D. Barnett, Mark J. Caruso, Albuquerque, for plaintiff-appellant.

Lamb, Metzgar & Lines, Farrell L. Lines, Albuquerque, for defendant-appellee Lacey.

Rodey, Dickason, Sloan, Akin & Robb, John M. Brant, Albuquerque, for defendant-appellee Liberty Mut.

OPINION

STOWERS, Justice.

Plaintiff–Appellants, the Regents of the University of New Mexico (the Regents), appeal from a judgment of dismissal ren-

dered in favor of defendant-appellee, Liberty Mutual Insurance Company (Liberty Mutual). The trial court determined that the action was time-barred under the New Mexico Hospital Lien Act, NMSA 1978, Sections 48–8–1 to –7 (Repl.Pamp.1987). We affirm.

The facts alleged in plaintiffs' complaint deemed admitted by the motion to dismiss and subsequently dealt with by the trial court as a motion for summary judgment are as follows: On March 29, 1985, an accident occurred between Thomas R. Wadsworth, the driver of an automobile, and defendant, Vincent Lacey, the driver of a motorcycle. The automobile was insured by Liberty Mutual. As a result of this accident, Lacey was treated at the University of New Mexico Hospital, operated by the Regents, from March 29 to August 12, 1985, incurring expenses in the amount of $20,594.51.

In accordance with NMSA 1978, Section 48–8–2, the Regents filed their notice of a hospital lien with the Clerk of Bernalillo County, dated April 26, 1985, with subsequent addenda on May 22, 1985, July 3, 1985, and February 16, 1986, and sent copies of the notices to all parties. A check in the amount of $58,265.35 was issued by Liberty Mutual on behalf of Wadsworth to Lacey and the law firm of Lamb, Metzgar, and Lines, P.A., for all the claims Lacey had against Wadsworth. The check was received by Lacey's counsel, Farrell Lines, on May 28, 1986. On November 10, 1986, Lines requested from the Regents a 50 percent reduction of the amount Lacey owed the hospital. The Regents informed Lines that the hospital is constitutionally prohibited from accepting less than full payment. Nonetheless, on January 15, 1987, Lacey, through his attorney Lines, sent to the hospital only $10,000 as full payment.

On June 19, 1987, the Regents brought this action against Lacey and Liberty Mutual for debt and money due on an open account and enforcement of their hospital lien. Liberty Mutual moved to dismiss pursuant to NMSA 1978, Section 48–8–3(B). That section provides: "Liability of the per-

son, firm or corporation for the satisfaction of the hospital lien shall continue *for a period of one year after date of any payment of any money to the patient, his heirs or legal representatives* as damages or under a contract of compromise or settlement." (emphasis added). After hearing oral argument on the motion, the trial court determined that the Regents' suit was time-barred since the effective date for the commencement of the statutory period of limitations was May 28, 1986. On that basis the court dismissed the case against Liberty Mutual with prejudice. This appeal follows.

Arguments made by the Regents on appeal are: (1) The mere tender of a release and two-party settlement check is not "payment of any money" under Section 48–8–3(B); (2) A payment to an attorney is not synonymous with payment to the legal representative under Section 48–8–3(B); and (3) A misrepresentation tolls the one-year statute of limitations in Section 48–8–3(B).

The check in the amount of $58,265.35 issued by Liberty Mutual and payable to Lacey and Lamb, Metzgar and Lines was received by Lines on May 28, 1986. Accompanying the check was a memorandum and release form from Liberty Mutual setting forth three prerequisites to creating a release. These were: "(1) Fill in the date the release is signed; (2) Write 'Have Read This Release'; and (3) Sign your name in front of a notary." The check was endorsed by Lacey and deposited into the law firm's trust account on November 6, 1986. The Regents had no knowledge of the check or the deposit into the trust account until November 6, 1986, when Lines informed the hospital that "we finally settled with the insurance company." The Regents contend there was no payment within the meaning of Section 48–8–3(B) until both Lacey and Lines negotiated the two-party settlement check and met the three requirements executing the release. Therefore, the Regents argue the one-year statutory time period did not begin to run before November 10, 1986.

■ "The delivery of a check does not, ordinarily, per se, constitute payment in a

legal sense." *Franciscan Hotel Co. v. Albuquerque Hotel Co.*, 37 N.M. 456, 472, 24 P.2d 718, 726 (1933). However if, when the check is delivered, the drawer has funds in the drawee bank to meet it, and the check is honored and paid upon presentment, the conditional nature of the payment becomes absolute and the date of payment will be deemed to have been made as of the date of the original delivery of the check. *Id.* "When a check is paid, the payment of the underlying debt becomes absolute and it is deemed paid as of the date of the giving of the check." 6 R. Anderson, *Anderson On The Uniform Commercial Code* § 3–802:19 (3d ed. 1984). Cases from other areas of the law also indicate that payment is made upon delivery of the check and not deposit in the bank. *See, e.g., Fletcher v. Ray*, 220 Ark. 844, 250 S.W.2d 734 (1952) (candidate's election fee is paid as of delivery of check when check is subsequently paid in due course); *Ogier v. Pacific Oil & Gas Dev. Corp.*, 135 Cal.App.2d 776, 288 P.2d 101 (1955) (payment for securities was made as of delivery of check when check is subsequently paid in due course); *Wayzata Enterprises, Inc. v. Herman*, 268 Minn. 117, 128 N.W.2d 156 (1964) (payment on real estate contract is deemed to be made as of delivery of check when check is subsequently paid in due course); *Finn v. National City Bank of N.Y.*, 36 N.Y.S.2d 545 (N.Y.City Ct.1942) (mailing of check by bank constitutes delivery so as to prevent attachment of debt in New York prior to presentment); *Texas Mut. Life Ins. Ass'n v. Tolbert*, 134 Tex. 419, 136 S.W.2d 584 (1940) (insurance premium is paid as of delivery of check when check is subsequently paid in due course).

■ Payment of any money for purposes of Section 48–8–3(B) occurred when Liberty Mutual delivered the check to Lines on May 28, 1986. Although it was not negotiated until November 6, 1986, when upon presentment the check was honored and paid, the date of payment is the date of the original delivery of the check. Further, there is no language in the statute that requires the execution of a release before triggering the one-year limitation period.

■ In addition, delivery of this check to Lines, Lacey's attorney, was "payment to the patient * * * or legal representative" as prescribed in Section 48–8–3(B). Settlement checks are usually given to attorneys on behalf of their clients. A legal representative, defined in its broadest sense, is one who stands in place of another and represents the interests of another; a person who oversees the legal affairs of another. *Black's Law Dictionary* 807 (5th ed. 1979). An attorney is an agent or one who is appointed and authorized to act in the place or stead of another. *Id.*, at 117. In considering the ordinary and usual meaning of the words used in this statute, an interpretation that an attorney may be a legal representative is not unreasonable. *See Regents of Univ. of N.M. v. Fireman's Fund Ins. Co.*, 103 N.M. 709, 711, 712 P.2d 1371, 1373 (1986).

We stated in *Regents of Univ. of N.M.*, 103 N.M. at 711–12, 712 P.2d at 1373–74, that payment to the patient is the act that triggers the running of the one-year limitation period. The clear language of Section 48–8–3(B) however contemplates compliance when payment is made either to "the patient ... or legal representative." We conclude that an attorney is a legal representative for purposes of receiving payment under this statute and to commence the running of the statute of limitations therein. "Where a statute grants a new remedy, and at the same time places a limitation of time within which the person complaining must act, the limitation is a limitation of the right as well as the remedy, and in the absence of qualifying provisions or saving clauses, the party seeking to avail himself of the remedy must bring himself strictly within the limitations." *Ortega v. Shube*, 93 N.M. 584, 586, 603 P.2d 323, 325 (Ct.App.1979) (quoting *Swallows v. City of Albuquerque*, 61 N.M. 265, 266, 298 P.2d 945, 946–47 (1956)). Upon failure to institute the action within the specified period beginning May 28, 1986, the Regents' right to do so ended.

Lastly, the Regents contend that Liberty Mutual should be estopped from raising the statute of limitations as a defense. The

doctrine of equitable estoppel, however, is not applicable to the facts in this case.

The essential elements of equitable estoppel as related to the party estopped, Liberty Mutual, are: (1) conduct (by Liberty Mutual) which amounts to a false representation or concealment of material facts; (2) intention (by Liberty Mutual) that such conduct shall be acted upon by the Regents; and (3) knowledge, actual or constructive, of the real facts (by Liberty Mutual). *Capo v. Century Life Ins. Co.,* 94 N.M. 373, 377, 610 P.2d 1202, 1206 (1980). The essential elements as related to the party claiming estoppel (the Regents) are: (1) lack of knowledge and means of knowledge of the truth as to the facts in question (by the Regents); (2) reliance (by the Regents) upon the conduct of the party estopped; and (3) action (by the Regents) based thereon of such a character as to prejudicially change its position. *Id. See also In re Estates of Salas,* 105 N.M. 472, 475, 734 P.2d 250, 253 (Ct.App.1987). "A party alleging and relying on a claim of estoppel has the burden of establishing all facts necessary to prove the claim." *In re Estates of Salas,* 105 N.M. at 475, 734 P.2d at 253.

Under the facts presented herein, the element of misrepresentation or concealment of material facts by Liberty Mutual was not shown. Furthermore, the Regents did not show that they lacked knowledge of the true facts with respect to the one-year statute of limitations. They knew that the statute began to run when payment was made. The Regents learned no later than November 1986 that payment had been made, yet did not file suit until June 1987. There is no estoppel in this case.

The judgment of the district court is affirmed and the parties will bear their own costs and attorney fees.

IT IS SO ORDERED.

SCARBOROUGH, C.J., and RANSOM, J., concur.

764 P.2d 876

**The MOUNTAIN STATES TELEPHONE AND TELEGRAPH COMPANY, a Colorado Corporation, Appellant,**

v.

**NEW MEXICO STATE CORPORATION COMMISSION, and AT & T Communications, Appellees.**

**No. 17317, 17409.**

Supreme Court of New Mexico.

Nov. 23, 1988.

tion services were not subject to regulation by the SCC. Mountain Bell collects through a recording function its interexchange carrier customers' use of long-distance lines belonging to other telephone companies and then bills and collects the fees for such long-distance service. Once Mountain Bell determines that users are delinquent in their long-distance service accounts, it also terminates telephone service to those customers under a denial for nonpayment (DNP) procedure. The SCC previously has regulated the DNP aspect of Mountain Bell's services to the interexchange carriers.

After conducting hearings, the SCC found that the billing service was an integral component of telecommunications service as a whole, that Mountain Bell had a monopoly over such service, and that the service included recording the transmission of telephone signals, which in turn involved the transmission of data within the network itself. From these findings, the SCC concluded that it had jurisdiction to regulate the service and entered an order accordingly.

Uncertain about which procedure to employ to obtain review of the SCC's order, Mountain Bell both sought to appeal the order under the Telecommunications Act, NMSA 1978, Section 63–9A–18 (Cum.Supp. 1988), and to remove the SCC decision for an independent review by this court pursuant to N.M. Const. art. XI, § 7. We undertake our review in accordance with the removal procedure because the sole issue for consideration is whether the SCC has jurisdiction under article XI, section 7 to regulate the service that Mountain Bell provides to other telecommunication carriers.

The constitution empowers the SCC with the duty to regulate telecommunications service to the public. *In re Generic Investigation into Cable Television Serv.*, 103 N.M. 345, 350, 707 P.2d 1155, 1160 (1985); N.M. Const. art. XI, § 7. Telecommunication services generally involve the transmission of signals, images, sounds, or data by wire, lightwaves, or electromagnetic means. NMSA 1978, § 63–9A–3(L) (Cum.Supp.1988). We have

Patrick T. Ortiz, New Mexico Gen. Atty., Albuquerque, for Mountain States Tel. and Tel. Co.

Joseph Van R. Clarke, Asst. Atty. Gen., Gen. Counsel, Santa Fe, for New Mexico Corp. Comn.

Rebecca DeCook, T. Larry Barnes, AT & T Communications of the Mountain States, Inc., Denver, Rodey, Dickason, Sloan, Akin & Robb, P.A., Diane Fisher, Albuquerque, for AT & T Communication of the Mountain States, Inc.

## OPINION

WALTERS, Justice.

The Mountain States Telephone and Telegraph Company, hereinafter Mountain Bell, petitioned the New Mexico State Corporation Commission (SCC) for a determination that its third-party billing and collec-

held that the broad, plenary authority which our constitution bestows upon the SCC extends to all of the rates and charges of telephone companies and other transmission companies. *In re Generic Investigation,* 103 N.M. at 349, 707 P.2d at 1159. In construing article XI, section 7, we have stated that it is "difficult to conceive of a more clear and all-inclusive grant of power for a governmental agency." *Mountain States Tel. & Tel. Co. v. New Mexico State Corp. Comm'n,* 90 N.M. 325, 331, 563 P.2d 588, 594 (1977). The SCC also has the authority to regulate the cost of facilities needed for telecommunications services which, in turn, affect the cost of providing those telecommunications, even if no transmission of signals is provided by the facilities. *See In re Regulation of Rates, Terms, and Conditions for Provision of Pole Attachment Space to Cable Television,* 102 N.M. 720, 722, 699 P.2d 1072, 1074 (1985); N.M. Const. art. XI, § 7.

 Authority is specifically granted to the Commission to regulate a public telecommunications service under the New Mexico Telecommunications Act. NMSA 1978, §§ 63–9A–1 to—20 (Cum.Supp.1988). As defined in the Telecommunications Act, "public telecommunications service means the transmission of signs, signals, writing, images, sounds, messages, data or other electromagnetic means originating and terminating in this state regardless of actual call routing." NMSA 1978, § 63–9A–3(L) (Cum.Supp.1988). The services rendered here by Mountain States as described above entail timing calls through switching operations, and transmitting such recorded data to its billing department. Clearly, transmission of signals is an integral part of the service, and that service (which carries with it a charge to the carriers who are using the service) must also fall within the SCC's authority and power to regulate tariffs. *See, In re Generic Investigation,* 103 N.M. at 348–49, 707 P.2d at 1158–59; *see also In re Regulation of Rates, Terms, and Conditions for Provision of Pole Attachment Space to Cable Television,* 102 N.M. at 722, 699 P.2d at 1074. When a telephone company offers service to others, which necessarily requires the use of facilities employed in providing telecommunications services by the telephone company, then SCC has constitutional authority to regulate the charges and rates for the service, and the duty to determine matters of public convenience and necessity relating to use of telephone company facilities.

 Moreover, the actions that Mountain Bell takes, insofar as it instigates termination for nonpayment of the unique privileges of telephone service, is distinctly a matter of public concern. DNP action impacts directly on the public interest because customers cannot obtain telephone service elsewhere if their local services are terminated. The SCC correctly determined that it should regulate Mountain Bell's DNP service on delinquent accounts because public convenience and necessity is incontestably implicated.

Accordingly, the SCC's order denying Mountain Bell's petition is affirmed in all respects.

IT IS SO ORDERED.

SCARBOROUGH, C.J., SOSA, Senior J., and STOWERS and RANSOM, JJ., concur.

764 P.2d 1307

**FIRST INTERSTATE BANK OF GALLUP, Petitioner,**

v.

**Cal W. FOUTZ and Keith L. Foutz, Respondents.**

**No. 17672.**

Supreme Court of New Mexico.

Nov. 21, 1988.

Keleher & McLeod, Arthur O. Beach, Albuquerque, for petitioner.

H. Vern Payne, Stacey A. Johnson, Albuquerque, Grant L. Foutz, Gallup, for respondents.

## OPINION

STOWERS, Justice.

We have granted certiorari to consider whether the trial court correctly instructed the jury on the measure of damages in this action for negligent misrepresentation.

Respondents-plaintiffs, Cal and Keith Foutz, brought this case against petitioner-defendant, First Interstate Bank of Gallup (FIBG), for fraud and negligent misrepresentation in connection with a transaction involving the respondents, FIBG, and a nonparty, Robert Berni. The respondents claimed that they were fraudulently or negligently induced to enter into a continuing guaranty and a hypothecation agreement

by an officer of FIBG, and sought rescission of these contracts. The trial court granted petitioner's motion for a directed verdict on the fraud claim and on some of the claims of negligent misrepresentation, but denied the motion on the claim of negligent misrepresentation of the value of Berni's assets. The jury returned a verdict in the amount of $75,000 for respondents and petitioner appealed. The court of appeals in a 2 to 1 decision affirmed the trial court. We agree with the dissenting opinion of the court of appeals and reverse and remand to the trial court to enter judgment for petitioner.

The basic facts are not in dispute and have been set out more fully in the court of appeals' opinion. In 1981 the Foutzes entered into a business transaction with Berni. Each of the brothers contributed $50,000 in cash to begin two businesses with Berni known as Buddy's Used Cars and B & F Auto Service and Wrecker Service. Berni contributed a wrecker service, including a wrecker's license and various car servicing equipment. The two businesses were managed and operated by Berni. Other than a written partnership resolution, there were no documents evidencing any contracts between the Foutzes and Berni. Thereafter, they had several disagreements about the operation of the businesses. In August 1981, Berni executed a $100,000 promissory note to Keith and Cal Foutz to reimburse them for their partnership investment. Berni made some payments on the note, but by December 1982 the note was past due.

In December 1982 or January 1983, the exact date is unclear in the record and briefs, Cal Foutz was told by an employee of FIBG that he was delinquent on a note. Since Cal was unaware of a past due note, he spoke with Kenneth Agee, who handled his accounts at FIBG and who was then its vice-president. Agee informed Cal that in September 1981 FIBG had extended Berni a $50,000 unsecured loan and in conjunction with this loan Berni had supplied FIBG with the partnership resolution. At the time of Cal's meeting with Agee, the $50,000 loan was past due and FIBG was looking to the Foutzes to make the payments.

■ After the initial meeting with Cal, another meeting was held with both Foutzes and Agee. FIBG agreed to loan Berni an additional $100,000 to pay the Foutzes' promissory note and, thereby, increase Berni's indebtedness to $163,703 (the other $63,703 was used to consolidate all of Berni's outstanding loans with FIBG). The Foutzes agreed to put the $100,000 in a certificate of deposit (CD) at FIBG. The Foutzes also signed a continuing guaranty of this loan to Berni up to the amount of $150,000 as well as a hypothecation agreement pledging their CD as security for the loan to Berni (a hypothecation agreement gives a creditor a right over personal property belonging to another and the power to take or sell that property to satisfy the creditor's claim). In the event Berni defaulted on his loan with FIBG, the hypothecation contract provided that the CD could be attached to satisfy Berni's indebtedness. FIBG also took a security interest in all the assets of Buddy's Used Cars and B & F Auto Service and Wrecker Service, and a security interest in Berni's residence and some of his personalty. As a result of this transaction, the Foutzes obtained a return on their $100,000 partnership investment in the form of quarterly interest payments from the CD and Berni's loans were consolidated and increased to $163,703.

The Foutzes received three quarterly interest payments on the CD for $7,200. Berni, however, defaulted on his loan. By a letter dated January 11, 1984, FIBG notified Cal that the bank had repossessed all collateral available to it under the loan agreement with Berni, and under the hypothecation agreement and continuing guaranty, it exercised its right to take the CD. At the time FIBG took the CD and applied it against the outstanding loan balance, there was a remaining balance in the amount of $21,741.08, which FIBG was expecting to satisfy out of the contract receivables from Buddy's Used Cars.

■ At issue in this case is jury instruction No. 19 given by the trial court on the measure of damages available to respon-

dents in an action for negligent misrepresentation. That instruction, in relevant part, stated:

> If you should decide in favor of the [respondents] on the question of liability, you must then fix the amount of money which will reasonably and fairly compensate them for any of the following elements of damages proved by the [respondents] to have resulted from the negligent misrepresentation as claimed: The value of the loss of the Certificate of Deposit. The value of the loss of interest on the Certificate of Deposit.

FIBG argues that this instruction is an improper statement of the damages under a theory of negligent misrepresentation because it instructs on the benefit of the bargain and not on actual out-of-pocket losses. The majority of the court of appeals did not agree with FIBG.

The court of appeals stated that the tort of negligent misrepresentation as articulated in the Restatement (Second) of Torts Section 552 (1977) was adopted in New Mexico in *Stotlar v. Hester*, 92 N.M. 26, 582 P.2d 403 (Ct.App.), *cert. denied*, 92 N.M. 180, 585 P.2d 324 (1978). *Accord Garcia v. Rodey, Dickason, Sloan, Akin & Robb, P.A.*, 106 N.M. 757, 761–62, 750 P.2d 118, 122–23 (1988). Comments (a) and (b) to Section 552 indicate that damages for negligent misrepresentation are determined by out-of-pocket loss or reliance damages. That measure of damages is set forth in Section 552B and provides:

> **Damages for Negligent Misrepresentation**
>
> (1) The damages recoverable for a negligent misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is a legal cause, including
>
> (a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and
>
> (b) pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation.
>
> (2) The damages recoverable for a negligent misrepresentation do not include the benefit of the plaintiff's contract with the defendant.

Restatement (Second) of Torts § 552B (1977). Because New Mexico follows the tort of negligent misrepresentation as set forth in the Restatement, it is not unreasonable to conclude that we would also follow the damages as set forth therein. Using 552B(1)(a) as the proper measure of damages, the court of appeals reasoned that, in the present case, the out-of-pocket loss was equal to the difference between the amount the Foutzes gave and the amount they received in the secured transaction with FIBG. In other words, the difference between what the Foutzes gave, a $100,000 CD plus unpaid interest, and what they received, nothing, was $100,000 plus interest. The majority opinion concluded that because the Foutzes gave the $100,000 CD and received nothing the value of the CD plus interest represented their out-of-pocket loss and instruction No. 19 correctly stated that measure of damages.

Jury instructions must state the law correctly and be based on the evidence. *Pittard v. Four Seasons Motor Inn, Inc.*, 101 N.M. 723, 727, 688 P.2d 333, 337 (Ct.App.), *cert. quashed*, 101 N.M. 555, 685 P.2d 963 (1984). "All instructions must be read together and, if they fairly present the issues and the applicable law, they are sufficient." *Id.* Reversal is warranted where the party complaining of faulty instructions shows evidence of prejudice. *Jewell v. Seidenberg*, 82 N.M. 120, 124, 477 P.2d 296, 300 (1970).

■ The dissent in the court of appeals' opinion agreed that the proper measure of damages in the present case is the out-of-pocket loss and not the benefit of the bargain, but disagreed that instruction No. 19 corresponds to that out-of-pocket loss or that respondents' proof established any out-of-pocket losses. Thus, the trial court's instruction could be considered a correct statement of damages if respondents' argument was accepted that what they gave in the transaction with FIBG was the $100,000 CD; otherwise jury instruction No. 19 instructed on the benefit of the bargain, an

inapplicable measure of damages in negligent misrepresentation.

We agree with the dissent that the instruction was on the benefit of the bargain and not on any out-of-pocket losses. At the time of the transaction with FIBG, the Foutzes had a past due $100,000 unsecured promissory note from Berni. No principal payments and only interest payments totalling $3,400 had been made on the note even though the Foutzes should have received $40,000 by then. FIBG had four outstanding loans to Berni with balances totalling $63,703. These loans were secured by personalty and Berni's mobile home. Berni wanted to consolidate them and in exchange was willing to give the bank a security interest in all of his business assets and in his personal residence. To refinance Berni's loans, the bank gave the Foutzes a $100,000 CD that retired the unsecured promissory note from Berni. In exchange for the CD, the Foutzes agreed to hypothecate that CD as security for the Berni loan of $163,703, and also to sign a continuing guaranty of the Berni loan up to $150,000.

The dissent correctly pointed out that the Foutzes would not have had the CD had FIBG not advanced that amount of money to Berni. FIBG certainly did not advance without any expectation of security or collateral in return that additional $100,000 to Berni so that he could pay off the Foutzes' promissory note. Instruction No. 19 directed the jury to award respondents the value of the CD, plus the value of the loss of the interest on the CD, if the jury found for respondents. The instruction allowed the Foutzes to recover the benefit of their bargain with FIBG and actually placed them in a better position than they occupied before entering into the transaction. As a result, the jury verdict in favor of respondents, which was for $75,000, represented the CD less 25 percent fault apportioned to respondents and Berni. Thus, the Foutzes recovered the benefit of their bargain, not their out-of-pocket losses.

The damages the Foutzes could have recovered under a theory of negligent misrepresentation, as set out in the Restatement, was the consideration they gave for entering into the transaction minus any value they received from that transaction, plus any pecuniary loss proximately resulting from reliance on the misrepresentation. The loss of the CD does not represent the difference between the value of what was received and its purchase price. Nor does it represent any other pecuniary loss as a result of reliance on the misrepresentation. It cannot be a pecuniary loss because the Foutzes would not have had the CD if they had not entered into the transaction with the bank, and, agreed that the CD could be attached if Berni defaulted. The Foutzes failed to present substantial evidence of any out-of-pocket damages they sustained as a result of their transaction with FIBG.

The verdict of the district court is reversed and judgment is entered in favor of petitioner.

IT IS SO ORDERED.

SCARBOROUGH, C.J., and RANSOM, J., concur.

WALTERS, J., specially concurs.

SOSA, Senior Justice, dissents.

WALTERS, Justice (specially concurring).

I adopt Judge Bivins's dissent, attached as my addendum hereto, as my special concurrence in this matter.

## ADDENDUM

BIVINS, Judge (dissenting).

I am unable to agree with the majority as to the instruction issue. Because that issue is dispositive and, in my opinion, requires reversal and remand for dismissal, I do not reach the second issue, sufficiency of the evidence to support a verdict of negligent misrepresentation.

The trial court instructed the jury, if it found defendant liable, to award plaintiffs the value of the certificate of deposit and the value of the loss of interest on the certificate of deposit. The trial court's instruction No. 19 is identical to plaintiffs' requested instruction No. 1, except for the

substitution of "negligent misrepresentation" for "fraudulent misrepresentation."

While I agree with the majority as to the proper measure of damages for negligent misrepresentation, as set forth in 3 Restatement (Second) of Torts, Section 552B (1977), I disagree the trial court's instruction No. 19 corresponds to that measure, or that plaintiffs' proof establishes any out-of-pocket loss. *See Pittard v. Four Seasons Motor Inn, Inc.*, 101 N.M. 723, 688 P.2d 333 (Ct.App.1984) (instructions must correctly state the law and be based on the evidence).

For clarity, I will set out the full text of Restatement, *supra,* Section 552B followed by the trial court's instruction No. 19:

Section 552B provides:

**Damages for Negligent Misrepresentation**

(1) The damages recoverable for a negligent misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is a legal cause, including

(a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and

(b) pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation. .

(2) *the damages recoverable for a negligent misrepresentation do not include the benefit of the plaintiff's contract with the defendant.* [Emphasis added.]

Instruction No. 19 provides in pertinent part:

If you should decide in favor of the Plaintiff [sic] on the question of liability, you must then fix the amount of money which will reasonably and fairly compensate them for any of the following elements of damages proved by the Plaintiffs to have resulted from the negligent misrepresentation as claimed:

The value of the loss of the Certificates [sic] of Deposit. The value of the loss of interest on the Certificates [sic] of Deposit.

As the comments to Restatement, *supra,* Section 552B indicate, out-of-pocket loss is the proper measure, not benefit of the contract as allowed for fraudulent misrepresentation. This court contrasted the two causes of action in *State ex rel. Nichols v. Safeco Insurance Co.*, 100 N.M. 440, 443, 671 P.2d 1151, 1154 (Ct.App.1983), and, in a footnote, pointed out that the liability for negligent misrepresentation is more restricted than for fraudulent misrepresentation. As stated in pertinent part in Restatement, *supra,* comment b to Section 552B:

The considerations of policy that have led the courts to compensate the plaintiff for the loss of his bargain in order to make the deception of a deliberate defrauder unprofitable to him, do not apply when the defendant has had honest intentions but has merely failed to exercise reasonable care in what he says or does.

Thus, the correct measure of damages is the difference between what plaintiffs gave and what they received. *See Williams v. Spazier*, 21 P.2d 470 (Cal.App.1933), subsequent opinion, 134 Cal.App. 340, 25 P.2d 851 (1933); *Chapman v. Marketing Unlimited, Inc.*, 14 Wash.App. 34, 539 P.2d 107 (1975). The trial court's instruction No. 19 can be considered a correct statement of this measure only if we accept plaintiffs' argument that what they gave in the transaction was the $100,000 certificate of deposit, otherwise, it instructs on the benefit of the bargain, a measure of damages not applicable in negligent misrepresentation cases.

The majority assert that since plaintiffs gave the $100,000 certificate of deposit and received nothing, the value of the certificate of deposit, plus interest, represents their "out-of-pocket loss," and, thus, conclude that the trial court's instruction No. 19 correctly states the measure of damages.

First, the majority misconstrue the transaction and what plaintiffs had to give. Before the three-way transaction occurred, all plaintiffs had was a $100,000 unsecured promissory note from Berni that was past due and on which they had received only

$3,400 interest. Funding for the $100,000 certificate of deposit given to plaintiffs by Berni to retire the promissory note came from the bank as a direct result of the bank refinancing Berni. The bank advanced the additional $100,000 used to purchase the certificate of deposit. In exchange for the certificate of deposit, plaintiffs agreed to hypothecate that certificate of deposit as security for the Berni loan and also to sign a continuing guaranty up to $150,000. Thus, by holding that plaintiffs gave up the $100,000 and got nothing, the majority have erroneously ignored the true nature of the transaction.

Second, given the fact that plaintiffs only had the promissory note, instruction No. 19 does not correctly state the measure of damages. Had there been proof of damages, the trial court should have instructed that if plaintiffs prevailed, their damages would be the difference between the value of their $100,000 promissory note as of the date of the transaction and its value when Berni defaulted to the bank, plus any pecuniary loss otherwise suffered as a consequence of plaintiffs' reliance on defendant's misrepresentation. Defendant requested an instruction along these lines but it was refused. Because no such evidence was offered as to out-of-pocket damages, the case should be remanded for dismissal.

In order to accept the majority's reasoning, it is necessary to separate the transaction into its components, isolate each component and then deny the relationship of each component to the others. When this is done, one might say that plaintiffs gave up the $100,000 certificate of deposit because at one point in time they had that certificate of deposit. This approach, however, ignores the fact that plaintiffs would not have had the certificate of deposit had defendant not advanced the additional $100,000 to Berni necessary to purchase that certificate of deposit. One would have to believe that defendant, with $63,703 in delinquent loans from Berni, simply decided to advance Berni an additional $100,000 so he could pay off plaintiffs' promissory note, with no expectation of further security in return. Incredulously, this is what plaintiffs argue on appeal. Plaintiffs cite

to nothing in the record to support their position. In fact, plaintiffs suggest that since defendant believed Berni had $300,000 in assets, it probably would have loaned him the additional $100,000 without the continuing guaranty or hypothecation. The issues framed will not support plaintiffs' argument. The jury only decided whether defendant negligently misrepresented Berni's assets. The nature of the transaction was not even an issue.

Plaintiffs also confuse the nature of the case as presented to the jury. They argue in their brief that instruction No. 19 properly restored plaintiffs to the "status quo ante," that is, their status before the transaction giving rise to their suit. This is incorrect. First, plaintiffs' claim for rescission based on fraudulent misrepresentation was dismissed at the end of their case-in-chief. The trial court instructed the jury only as to one of plaintiffs' claims for damages based on negligent misrepresentation. Plaintiffs objected to the issue instruction, but have taken no appeal from either the dismissal of their rescission count or the instruction given. Moreover, as the majority correctly note, the case could not have been submitted to a jury on a rescission theory. "Rescission is an equitable remedy, so it is tried by the court without a jury." Committee Comment to SCRA 1986, 13–814.

Second, instruction No. 19 does not in any way attempt to restore the status quo ante. It directs the jury to award plaintiffs the value of the certificate of deposit, plus the value of the loss of interest on the certificate of deposit, if they find in favor of plaintiffs. As a result, plaintiffs recovered $75,000, which represents the certificate of deposit, less 25% fault apportioned to plaintiffs and Berni. The net effect is that there has been no rescission. Plaintiffs have an award of $75,000, but are still liable on the continuing guaranty. Thus, plaintiffs have the benefit of the bargain, not their out-of-pocket loss.

structed the jury on defendant's theory of the case. This is incorrect. There was only one instruction on the measure of damages and that was instruction No. 19. The majority hint that defendant's theory of the case, that plaintiffs have not been damaged because they had not been able to collect on the promissory note, as set forth in the statement of issues instruction, can be considered along with instruction No. 19. The issues instruction only contains the parties' contentions and, surely, does not override the trial court's instruction on damages. There was only one instruction given on damages, and that was No. 19. And it was incorrect. Further, even if defendant's contention can be construed as a correct statement of law, still it would not cure the trial court's conflicting, incorrect statement of the same principle. *See Chapin v. Rogers*, 80 N.M. 684, 459 P.2d 846 (Ct.App.1969).

### No. 9235.

Court of Appeals of New Mexico.

March 29, 1988.

## FACTS

